[No. S081900. Aug. 30, 2001.]

GOLDEN GATEWAY CENTER, Plaintiff, Cross-defendant and
Appellant, v.
GOLDEN GATEWAY TENANTS ASSOCIATION, Defendant,
Cross-complainant and Respondent.

1014

## COUNSEL

Bartko, Zankel, Tarrant & Miller, Glenn P. Zwang and Howard L. Pearlman for Plaintiff, Cross-defendant and Appellant.

James S. Burling and Harold E. Johnson for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiff, Cross-defendant and Appellant.

Edward J. Sack; Law Offices of Jo Anne M. Bernhard and Jo Anne M. Bernhard for California Business Properties Association and International Council of Shopping Centers as Amici Curiae on behalf of Plaintiff, Cross-defendant and Appellant.

Pahl & Gosselin, Stephen D. Pahl and Karen M. Kubala for California Apartment Association as Amicus Curiae on behalf of Plaintiff, Cross-defendant and Appellant.

De Vries & Gold, Law Offices of Robert De Vries, Carolyn Gold and Robert De Vries for Defendant, Cross-complainant and Respondent.

Jonathan P. Hiatt; Altshuler, Berzon, Nussbaum, Rubin & Demain and Scott A. Kronland for American Federation of Labor and Congress of Industrial Organizations as Amicus Curiae on behalf of Defendant, Cross-complainant and Respondent.

Alan L. Schlosser; Morris D. Lipson; Chapman, Popik & White and Susan M. Popik for American Civil Liberties Union of Northern California as Amicus Curiae on behalf of Defendant, Cross-complainant and Respondent.

Michael Somers, Gerald J. Van Gemert and James Arthur Judge for Association of Alternative Postal Systems, Inc., Los Angeles Newspaper Group, Advertising Consultants, Inc., CIPS Marketing Group, Inc., Turtle Ridge Media Group, Inc., and National Directory Company, Inc., as Amici Curiae on behalf of Defendant, Cross-complainant and Respondent.

## OPINION

**BROWN, J.**—In a groundbreaking decision over 20 years ago, we departed from the First Amendment jurisprudence of the United States Supreme Court and extended the reach of the free speech clause of the California Constitution to privately owned shopping centers. (*Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 910 [153 Cal.Rptr. 854, 592 P.2d 341] (*Robins*), affd. *sub nom. Pruneyard Shopping Center v. Robins* (1980) 447 U.S. 74 [100 S.Ct. 2035, 64 L.Ed.2d 741].) Since then, courts and commentators have struggled to construe *Robins* and determine the scope of protection provided by California's free speech clause. Today, we clarify *Robins* and consider whether a tenants association has the right to distribute its newsletter in a privately owned apartment complex under article I, section 2, subdivision (a) of the California Constitution.[1] We conclude it does not.

### BACKGROUND

Golden Gateway Center (Golden Gateway), a limited partnership, owns a retail and residential apartment complex (Complex) in downtown San Francisco. The Complex consists of four high-rise buildings and a group of townhouses and contains 1,254 residential units. Although the Complex contains a number of retail establishments at the ground level, these retail establishments are separate from the residential units and do not have access to the residential portions of the Complex.

In the residential portion of the Complex, Golden Gateway emphasizes privacy and security. Consistent with this emphasis, Golden Gateway provides doormen during the daytime and 24-hour roving security patrols, and limits access to residential tenants and their invitees. Golden Gateway also

---

[1]All further undesignated article references are to the California Constitution unless otherwise indicated.

promulgates building standards incorporated by reference in every residential lease agreement. At all relevant times, these standards banned all solicitation in the building. As part of their lease agreements, all residential tenants agree to abide by these standards, and Golden Gateway retains the right to "make amendments to the Building Standards and adopt further Building Standards as in Owner's opinion are reasonable or desirable for the proper and orderly care, use and operation of the Apartment and Building and its grounds . . . ."

In 1982, a group of residential tenants in the Complex formed a tenants association called the Golden Gateway Tenants Association (Tenants Association). Since its inception, the Tenants Association has periodically distributed a newsletter on or under the apartment doors of all residential tenants. For approximately 11 years, building management did not object to the distribution of these newsletters.

In 1993, however, the manager of the Complex asked the Tenants Association to stop distributing newsletters on or under apartment doors. In support, the manager cited the prohibition against "soliciting within the building" found in the building standards in effect at that time. The Tenants Association responded with several letters from attorneys asserting its constitutional right to free speech and threatening legal action. Hoping to avoid litigation, the manager told the Tenants Association that "Golden Gateway Center management will not oppose the distribution of newsletters under apartment doorways by members of the Golden Gateway Tenants' Association provided it is done in a reasonable manner." Based on this representation, the Tenants Association resumed its "practice of distributing GGTA newsletters to all tenants by sliding them under doors . . . ." Neither building management nor the Tenants Association, however, discussed or defined what "a reasonable manner" meant.

Golden Gateway hired a new building manager in 1995. In early 1996, the Tenants Association sharply increased its leafletting activity and distributed at least eight separate newsletters and notices from February to May. Because of this increased activity, the new manager asked the Tenants Association to scale back its leafletting and to limit its distributions to newsletters. Citing the First Amendment of the United States Constitution, the Tenants Association refused and continued to distribute its newsletter to all residential tenants.

Soon after, Golden Gateway revised its building standards. The revised standards stated in relevant part: "Any solicitation within the building is

absolutely forbidden. This includes, for example, solicitation for profit, political purpose or any other reason, whether in writing or in person. . . . [¶] Leafleting within the building is absolutely forbidden. This includes, for example, posting leaflets or notices anywhere in the buildings other than on the bulletin boards located in the laundry rooms, sliding leaflets or other papers underneath tenants' doors, placing leaflets or other papers on or about tenants' doors, or leaving multiple copies of leaflets or other papers in any common areas. The only exception to this rule is where a tenant specifically requests that papers be delivered to him or her either under or in front of his or her door. . . ." Golden Gateway mailed a copy of the new standards to each residential tenant and explained that each tenant must comply with these standards pursuant to his or her lease agreement.

Despite the new building standards, the Tenants Association continued to distribute its newsletter door-to-door. Golden Gateway then filed a complaint, seeking to enjoin the Tenants Association from distributing leaflets "in and around their apartment doors." The Tenants Association responded by filing a cross-complaint for injunctive and declaratory relief. The cross-complaint contended, among other things, that the Tenants Association had a constitutional right to distribute its newsletters.

The trial court initially issued a preliminary injunction enjoining the Tenants Association from leafletting. After trial, however, the court dissolved the injunction and held that the Tenants Association had "a binding contractual right to distribute its newsletter throughout" the Complex "by placing its newsletters under the doors of all tenants, on the door knobs of tenants, and on bulletin boards that are provided." Upon resolving the case on contractual grounds, the court declined to reach the constitutional free speech issues.

The Court of Appeal reversed. After concluding that Golden Gateway did not enter into "a binding lease agreement modifying its Building Standards" with the Tenants Association based on the first manager's representation, the court held that the Tenants Association had no right to leaflet in the Complex under the United States or California Constitution.

We granted review to determine: (1) whether the tenants association of a large apartment complex has the right, under the California Constitution, to distribute its newsletter and other leaflets concerning residence in the complex to tenants in the building; and, if so, (2) whether a ban on the distribution of these materials to tenants constitutes an unreasonable time, place and manner restriction on free speech.

DISCUSSION

I

█ In *Hudgens v. NLRB* (1976) 424 U.S. 507, 519-520 [96 S.Ct. 1029, 1036-1037, 47 L.Ed.2d 196] (*Hudgens*), the United States Supreme Court held that a union had no federal constitutional right to picket in a shopping center because the actions of the private owner of the shopping center did not constitute state action. *Hudgens, supra,* at pages 518-519 [96 S.Ct. at pages 1035-1036], expressly reversed *Food Employees v. Logan Plaza* (1968) 391 U.S. 308 [88 S.Ct. 1601, 20 L.Ed.2d 603] (*Logan Plaza*), by clarifying and extending the court's ruling in *Lloyd Corp. v. Tanner* (1972) 407 U.S. 551, 570 [92 S.Ct. 2219, 2229-2230, 33 L.Ed.2d 131] (*Lloyd*) (holding that political leafletters had no federal free speech rights in a privately owned shopping mall). As acknowledged by both parties, *Hudgens* and *Lloyd* establish that the Tenants Association has no right to distribute its newsletter door-to-door under the United States Constitution. The lack of federal constitutional protection does not, however, "limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." (*Pruneyard Shopping Center v. Robins, supra,* 447 U.S. at p. 81 [100 S.Ct. at pp. 2040].) Thus, the Tenants Association may still prevail if the free speech clause of the California Constitution protects its leafetting activities. (Art. I, § 2, subd. (a).) As explained below, we conclude it does not.

Article I, section 2, subdivision (a) states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Unlike the United States Constitution, which couches the right to free speech as a limit on congressional power (see U.S. Const., 1st Amend.),[2] the California Constitution gives "[e]very person" an affirmative right to free speech (Cal. Const., art. I, § 2, subd. (a)). Accordingly, we have held that our free speech clause is "more definitive and inclusive than the First Amendment . . . ." (*Wilson v. Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116].)

Consistent with this more expansive interpretation of California's free speech clause, we have declined to follow the First Amendment jurisprudence of the United States Supreme Court in certain circumstances. Perhaps

---

[2]The First Amendment of the United States Constitution states in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ."

our most noteworthy departure from this jurisprudence occurred in *Robins*. In *Robins*, the majority reversed *Diamond v. Bland* (1974) 11 Cal.3d 331 [113 Cal.Rptr. 468, 521 P.2d 460] (*Diamond II*), and held that "sections 2 and 3 of article I of the California Constitution protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." (*Robins, supra,* 23 Cal.3d at p. 910.) In doing so, the majority rejected the approach of *Hudgens* and *Lloyd* and reasserted the independent force of the California Constitution.[3] (See *Robins,* at pp. 908-909.)

Despite the clarity of its ultimate disposition, *Robins* was less than clear "as to the scope of the free speech rights it was recognizing." (Brownstein & Hankins, *Pruning Pruneyard: Limiting Free Speech Rights Under State Constitutions on the Property of Private Medical Clinics Providing Abortion Services* (1991) 24 U.C. Davis L.Rev. 1073, 1090 (*Pruning Pruneyard*).) For example, *Robins* did not address the threshold issue of whether California's free speech clause protects against only state action or also against private conduct. (See *Laguna Publishing Co. v. Golden Rain Foundation* (1982) 131 Cal.App.3d 816, 838 [182 Cal.Rptr. 813] (*Laguna Publishing*) [finding *Robins* "intriguing" because it never discussed or impliedly dealt with "the phenomenon of *state action*"].) *Robins* also provided little guidance on how to apply it outside the large shopping center context. (*Pruning Pruneyard, supra,* 24 U.C. Davis L.Rev. at p. 1092 [*Robins* did not provide "useful guidance on how this new constitutional journey was to proceed"].) Not surprisingly, numerous legal commentators have pointed out and questioned these curious omissions in *Robins*.[4] Moreover, most of our sister courts interpreting state constitutional provisions similar in wording to California's

---

[3]In holding that high school students had a state constitutional right to solicit signatures in a privately owned shopping center, *Robins* weighed the students' right to free speech against the property rights of the owner of the shopping center. (*Robins, supra,* 23 Cal.3d at pp. 910-911.) *Robins* did not, however, consider the free speech rights of the owner under the California Constitution. (See *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 513 [101 Cal.Rptr.2d 470, 12 P.3d 720] (*Gerawan*) [holding that California's free speech clause grants "a right to refrain from speaking at all as well as a right to speak freely"].) We express no opinion here as to the role of these rights in ascertaining the scope of free speech rights guaranteed by article I, section 2, subdivision (a).

[4](See, e.g., Friedelbaum, *Private Property, Public Property: Shopping Centers and Expressive Freedom in the States* (1999) 62 Alb. L.Rev. 1229, 1239 (*Private Property, Public Property*) ["It is difficult to understand how a threshold issue [state action] of such importance could have been overlooked except for the fervency of both federal and state courts to attain other objectives" (fn. omitted)]; Kelso, *California's Constitutional Right to Privacy* (1992) 19 Pepperdine L.Rev. 327, 413 (*California's Right to Privacy*) ["the court in *Pruneyard* does not resolve whether the free speech clause applies to *all* private conduct which burdens speech or only to private conduct imbued with public elements sufficient to trigger the protections of the Declaration of Rights"]; *Pruning Pruneyard, supra,* 24 U.C. Davis L.Rev. at pp. 1090,

free speech provision have declined to follow *Robins*.[5] Indeed, some of these courts have been less than kind in their criticism of *Robins*. (See, e.g., *SHAD*

1092 [expressing surprise at *Robins's* failure to address the state action issue and noting other analytical problems]; Devlin, *Constructing an Alternative to "State Action" as a Limit on State Constitutional Rights Guarantees: A Survey, Critique and Proposal* (1990) 21 Rutgers L.J. 819, 832 (*Constructing an Alternative*) ["the [*Robins*] court was less explicit about its reasons for applying the state constitution . . . [and] did not clarify whether it rejected a state action requirement or simply broadened the federal definition of 'state action' to embrace the peculiar facts of the case" (fn. omitted)]; Simon, *Independent but Inadequate: State Constitutions and Protection of Freedom of Expression* (1985) 33 U. Kan. L.Rev. 305, 325-336 (*State Constitutions and Protection of Freedom of Expression*) ["The *Pruneyard* court did not explain why this [free speech] burden applied to private parties . . . [and] did not attempt to delineate the scope of California's affirmative right of freedom of expression"]; Comment, *State Constitutional Rights of Free Speech on Private Property: The Liberal Loophole* (1982/1983) 18 Gonz. L.Rev. 81, 94 (*State Constitutional Rights of Free Speech*) ["The California Supreme Court in *Robins*, however, never expressly rejected this [state action] prerequisite and in fact simply avoided the issue"]; Comment, *Transforming the Privately Owned Shopping Center into a Public Forum: Pruneyard Shopping Center v. Robins* (1981) 15 U. Rich. L.Rev. 699, 720 [*Robins* is "confusingly broad"]; Note, *Robins v. Pruneyard Shopping Center: Free Speech Access to Shopping Centers Under the California Constitution* (1980) 68 Cal. L.Rev. 641, 645 (*Free Speech Access to Shopping Centers*) [suggesting that the court was not prepared to address the state action issue in *Robins*]; but see, e.g., Ragosta, *Free Speech Access to Shopping Malls Under State Constitutions: Analysis and Rejection* (1986) 37 Syracuse L.Rev. 1, 21 (*Free Speech Access to Shopping Malls*) [observing that "only California has completely and clearly rejected a state action limitation upon free speech" (fn. omitted)]; Utter, *The Right to Speak, Write, and Publish Freely: State Constitutional Protection Against Private Abridgment* (1985) 8 U. Puget Sound L.Rev. 157, 169 ["Although the [*Robins*] court did not expressly state that the California Constitution had no state action requirement, the Washington court has interpreted *Robins* as impliedly abandoning any state action requirement for the California Constitution" (fn. omitted)].)

[5](See, e.g., *Fiesta Mall Venture v. Mecham Recall Committee* (1988) 159 Ariz. 371 [767 P.2d 719, 724] (*Fiesta Mall Venture*) [finding no state constitutional right to free speech in a privately owned shopping center]; *Cologne v. Westfarms Assocs.* (1984) 192 Conn. 48 [469 A.2d 1201, 1210] (*Cologne*) [same]; *Cahill v. Cobb Place Associates* (1999) 271 Ga. 322 [519 S.E.2d 449, 450-451] (*Cahill*) [same]; *Eastwood Mall, Inc. v. Slanco* (1994) 68 Ohio St.3d 221 [626 N.E.2d 59, 61-62] (*Eastwood Mall*) [same]; *Woodland v. Michigan Citizens Lobby* (1985) 423 Mich. 188 [378 N.W.2d 337, 358 (*Woodland*) [same]; *State v. Wicklund* (Minn. 1999) 589 N.W.2d 793, 802 (*Wicklund*) [same]; *S.O.C., Inc. v. Mirage Casino-Hotel* (Nev. 2001) 23 P.3d 243, 250 (*S.O.C.*) [declining to adopt the rationale of *Robins*]; *SHAD Alliance v. Smith Haven Mall* (1985) 66 N.Y.2d 496, 501, fn. 5 [498 N.Y.S.2d 99, 102] (*SHAD Alliance*) [finding no state constitutional right to free speech in a privately owned shopping center]; *Southcenter Joint Venture v. National Democratic Policy Com.* (1989) 113 Wash.2d 413 [780 P.2d 1282, 1292] (*Southcenter Joint Venture*) [same]; *Jacobs v. Major* (1987) 139 Wis.2d 492 [407 N.W.2d 832, 841] (*Jacobs*) [same]; but see *Bock v. Westminster Mall Co.* (Colo. 1991) 819 P.2d 55, 61-63 [finding a state constitutional right to leaflet in a privately owned shopping center]; *New Jersey Coalition Against War v. J.M.B. Realty Corp.* (1994) 138 N.J. 326 [650 A.2d 757, 780, 52 A.L.R. 5th 777] (*New Jersey Coalition Against War*) [same].)

Various state courts have also held that a state constitutional provision concerning the right to petition does not protect the solicitation of signatures in a privately owned shopping center. (See, e.g., *Stranahan v. Fred Meyer, Inc.* (2000) 331 Or. 38 [11 P.3d 228, 243] [finding no

*Alliance, supra,* 488 N.E.2d at p. 1214, fn. 5; *Jacobs, supra,* 407 N.W.2d at p. 841.)

Nonetheless, *Robins* has been the law in California for over 20 years. Whether or not we would agree with *Robins'*s recognition of a state constitutional right to free speech in a privately owned shopping center if we were addressing the issue for the first time, we are obliged to follow it under principles of stare decisis. ■ " '[E]ven in constitutional cases, the doctrine [of stare decisis] carries such persuasive force that we have always required a departure from precedent to be supported by some "special justification." ' " (*Dickerson v. United States* (2000) 530 U.S. 428, 443 [120 S.Ct. 2326, 2336, 147 L.Ed.2d 405], quoting *United States v. International Business Machines Corp.* (1996) 517 U.S. 843, 856 [116 S.Ct. 1793, 1801, 135 L.Ed.2d 124].) Because *Robins* is embedded in our free speech jurisprudence with no apparent ill effects, no such justification exists here.

■ We are, however, mindful of the ambiguities in *Robins.* In the hopes of clarifying *Robins* and providing some guidance as to the scope of the free speech rights guaranteed by the California Constitution, we now answer some of the questions left open by *Robins.* Based on these answers, we hold that the Tenants Association has no state constitutional right to leaflet in the Complex.

## II

"[B]efore state courts can fully resolve . . . substantive free speech . . . issues, a proper constitutional analysis requires that they first address the threshold issue of whether the . . . suits are barred by a state action requirement." (Note, *Post-Pruneyard Access to Michigan Shopping Centers: The "Malling" of Constitutional Rights* (1983) 30 Wayne L.Rev. 93, 97, fn. omitted (*Post-Pruneyard Access*); see also *Private Property, Public Property, supra,* 62 Alb. L.Rev. at p. 1239 [state action question should be "a threshold issue" in any analysis of constitutional free speech rights].) Thus, by neglecting to mention state action, *Robins* created a noticeable gap in its reasoning and left the existence of a state action limitation on California's free speech clause in doubt. (*California's Right to Privacy, supra,* 19 Pepperdine L.Rev. at p. 413; *Free Speech Access to Shopping Centers, supra,* 68 Cal. L.Rev. at p. 645.) Indeed, our lower courts have commented on this "intriguing"

state constitutional right to petition in a privately owned shopping center]; *Citizens for Ethical Gov. v. Gwinnett* (1990) 260 Ga. 245 [392 S.E.2d 8, 9-10] [same]; but see *Batchelder v. Allied Stores Intern., Inc.* (1983) 388 Mass. 83 [445 N.E.2d 590, 595, 38 A.L.R.4th 1206] [finding a state constitutional right to solicit signatures in a privately owned shopping center pursuant to a clause in the Massachusetts Constitution concerning freedom and equality of elections].)

omission. (*Laguna Publishing, supra*, 131 Cal.App.3d at p. 838.) Not surprisingly, the uncertainty surrounding the fate of the state action limitation has spawned a debate over the wisdom of extending our free speech clause to private actors.[6] We now fill this gap and conclude that California's free speech clause contains a state action limitation.

As an initial matter, we note that the first sentence of article I, section 2, subdivision (a) contains no explicit state action limitation. The California Constitution gives every person the right to "freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." (Art. I, § 2, subd. (a).) The breadth of this language combined with the framers' arguable understanding of its ramifications suggests an intent to protect the right to free speech against private intrusions. (*Private Actors, supra*, 17 Hastings Const. L.Q. at pp. 119-121.) The express prohibition against a "law" restraining or abridging free speech found in the second sentence of the clause arguably bolsters such an interpretation. (Art. I, § 2, subd. (a).)

Nonetheless, the absence of an explicit state action limitation in article I, section 2, subdivision (a) is not dispositive. In the past, we have found a state action requirement even though the language of the California constitutional provision in question—article I, section 7—did not expressly state such a requirement. (*Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 468 [156 Cal.Rptr. 14, 595 P.2d 592] (*Gay Law Students Assn.*); see also *Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 333 [70 Cal.Rptr.2d 844, 949 P.2d 941] [stating that the search and seizure provision of the California Constitution—article I, section 13—contains a state action limitation even though the provision contains no such limiting language].) We declined to apply that provision "without regard to any state action doctrine whatsoever" absent some "suggestion" in the provision's history for abandoning such a limitation. (*Gay Law Students Assn.*, at p. 468.) Thus, "[t]he omission [of state action language] . . . does not necessarily evince an intent to apply constitutional guarantees to private parties." (Margulies, *A*

---

[6](See, e.g., Eule & Varat, *Transporting First Amendment Norms to the Private Sector: With Every Wish There Comes a Curse* (1998) 45 UCLA L.Rev. 1537; Chemerinsky, *More Speech is Better* (1998) 45 UCLA L.Rev. 1635; Varat, *When May Government Prefer One Source of Private Expression Over Another?* (1998) 45 UCLA L.Rev. 1645; *Pruning Pruneyard, supra*, 24 U.C. Davis L.Rev. 1073; Friesen, *Should California's Constitutional Guarantees of Individual Rights Apply Against Private Actors?* (1989) 17 Hastings Const. L.Q. 111 (*Private Actors*); Sundby, *Is Abandoning State Action Asking Too Much of the Constitution?* (1989) 17 Hastings Const. L.Q. 139; *Free Speech Access to Shopping Centers, supra*, 68 Cal. L.Rev. 641; *Free Speech Access to Shopping Malls, supra*, 37 Syracuse L.Rev. 1; Cohen, *Pruneyard Shopping Center v. Robins: Past, Present and Future* (1981) 57 Chi.-Kent L.Rev. 373 (*Pruneyard Shopping Center*).)

*Terrible Beauty: Functional State Action Analysis and State Constitutions* (1988) 9 Whittier L.Rev. 723, 729 (*A Terrible Beauty*).)

Moreover, the language of article I, section 2, subdivision (a) equally supports a state action limitation. The second sentence of the clause—which prohibits any "law" from restraining or abridging "liberty of speech" (*ibid.*)—indicates an intent to protect against only state actions. "Adding this prohibition on oppressive laws might mean that, although the delegates wished to declare generally the sanctity of free expression, they feared only government intrusions." (*Private Actors, supra,* 17 Hastings Const. L.Q. at p. 121.) Such a reading is consistent with the view courts take of the Fourth Amendment, which is similar in structure to California's free speech clause. (*Ibid.*)

Thus, as acknowledged by the primary scholar cited by the dissent, the language of California's free speech clause is ambiguous and supports *either* the presence or absence of a state action limitation. (*Private Actors, supra,* 17 Hastings Const. L.Q. at p. 125 ["The text does not compel a finding that private parties are bound; it only creates an opportunity to do so"]; see *id.* at p. 121; see also *A Terrible Beauty, supra,* 9 Whittier L.Rev. at p. 729.) Where, as here, the text is "not conclusive" (*Private Actors, supra,* 17 Hastings Const. L.Q. at p. 121), we must look to the history behind California's free speech clause for guidance (see *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 16 [26 Cal.Rptr.2d 834, 865 P.2d 633] (*Hill*)). This history indicates that the framers intended to impose a state action requirement. (See *Gay Law Students Assn., supra,* 24 Cal.3d at p. 468 [finding a state action limitation based on the history behind the due process and equal protection clauses of the California Constitution].)

We initially note that the debates over the California Constitution do not show an intent to extend the reach of its free speech clause to private actors. Although "the designation of article I's free speech clause has changed appreciably over the years . . . its language has not." (*Gerawan, supra,* 24 Cal.4th at p. 489.) Thus, the current incarnation of California's free speech clause is virtually identical to the free speech clause in the original California Constitution adopted in 1849. (Compare Cal. Const., art. I, § 2, subd. (a), with Cal. Const. of 1849, art. I, § 9.) The original framers adopted this language with *no debate*. (See Browne, Rep. of Debates in Convention of Cal. on Formation of State Const. (1973 ed.) p. 41 (Browne); see also *Private Actors, supra,* 17 Hastings Const. L.Q. at p. 119.) In fact, "[t]he debates, which on other provisions are quite detailed, contain no record of any 'original intent' of these delegates in regard to the private/public distinction." (*Private Actors, supra,* 17 Hastings Const. L.Q. at p. 119.) Thus,

the debates over California's free speech clause give *no* indication that the framers wished to guard against private infringements on speech.

Meanwhile, the historical antecedents of our free speech clause strongly suggest that the framers of the California Constitution intended to include a state action limitation. Many of the framers of the 1849 California Constitution came from New York. (See Browne, *supra*, at pp. 478-479.) Not surprisingly, in drafting the free speech clause, the framers borrowed from the free speech clause of the New York Constitution. (Browne, *supra*, at p. 31.) Because they adopted New York's free speech clause virtually unchanged and with no debate (*Private Actors*, *supra*, 17 Hastings Const. L.Q. at p. 119), the history behind New York's clause is relevant to interpreting California's free speech clause (see *Citizens for Parental Rights v. San Mateo County Bd. of Education* (1975) 51 Cal.App.3d 1, 25-26, fn. 26 [124 Cal.Rptr. 68, 82 A.L.R.3d 544] [finding the history behind the New York Constitution relevant to interpreting a clause of the California Constitution based on a clause in the New York Constitution]).

A review of this history reveals that the framers of the New York Constitution intended its free speech clause "to serve as a check on governmental, not private, conduct." (*SHAD Alliance*, *supra*, 488 N.E.2d at p. 1214.) The free speech clause of the New York Constitution was adopted in 1821 as part of that Constitution's Bill of Rights and remained essentially unchanged after New York revised its Constitution in 1846.[7] "The explicit reason [behind the adoption of New York's free speech clause] was to prevent the legislature from restricting these freedoms by statute." (Galie, The New York State Constitution (1991) p. 51, fn. omitted.) As one of the delegates to New York's 1821 constitutional convention explained, the free speech clause "was doubtless intended to secure the citizens . . . against the arbitrary acts of the legislature . . . ." (Carter & Stone, Reports of the Proceedings and Debates of the Convention of 1821 (1821) p. 167 (Reports of the Proceedings).) In addition, the delegates to the 1821 New York constitutional convention viewed the free speech clause as protection against the "usurpations by our judiciary" of libel actions from the jury. (*Id.* at p. 490; see also *id.* at p. 167.) The framers of New York's free speech clause, however, were not concerned with private interference with speech. "[W]hile

---

[7](See 5 Thorpe, The Federal and State Constitutions (1909) pp. 2648, 2654; see also Reiner & Size, *The Law Through a Looking Glass: Our Supreme Court and the Use and Abuse of the California Declaration of Rights* (1992) 23 Pacific L.J. 1183, 1197 ["In order to appreciate the intellectual origins of our California Declaration of Rights, it is necessary to understand, first, that it was the 1846 New York Constitution . . . which our delegates were looking at in Monterey in 1849. Second, the provisions of the 1846 bill of rights for the most part trace their language to the 1821 constitution"].)

most of the delegates were eager to defend the public's rights against official or legal interference, they were unwilling to countenance unlimited freedom of expression . . . ." (Casias, The New York State Constitutional Convention of 1821 and its Aftermath (Colum. U. 1967) p. 139.)

Indeed, the framers of the 1821 New York Constitution viewed the Constitution's Bill of Rights, including its free speech clause, as a bulwark against government oppression, not private conduct. (See Reports of the Proceedings, *supra*, at pp. 59, 163, 171-172.) As one delegate explained, "[a] bill of rights setting forth the fundamental provisions of our government, has always been held sacred, and I have seen, as other gentlemen familiar with legislation must have seen, the utility of this bill of rights . . . one calculated to restrain useless and improvident legislation." (*Id.* at p. 163.) Another delegate later reiterated this understanding: "[A] bill [of rights] like this reported, is not a bill enumerating the rights of the people, but restricting the power of the legislature." (*Id.* at p. 172.) According to this same delegate, a "bill of rights, setting forth the privileges of the people would be useless, nay, might be injurious; because in purporting to set forth the rights of the people, if any were omitted, they might be considered to be yielded." (*Ibid.*)

This elucidation of the intent behind New York's free speech clause also conforms with the framers' understanding of the overarching purpose behind the 1821 New York Constitution. "The intent of the constitution that we are framing, and of every constitution, is to distribute to these [government] agents the power thus derived from the people:—to mark the limits of their authority, and provide the means of restraining them in its exercise, within their appropriate sphere." (Reports of the Proceedings, *supra*, at p. 110.)

Pre-1849 judicial statements regarding the scope of New York's free speech clause further confirm that the framers of the New York Constitution intended to protect against only government encroachments. As the Chancery Court of New York observed, "[t]hat great principle of a free government[,] the liberty of speech and of the press, is very wisely guarded by a constitutional provision against the encroachment of *either legislation or judicial power*." (*Wetmore v. Scovell* (N.Y.Ch. 1842) 3 Edw. Ch. 543, 562, italics added.)

Thus, the framers of the New York Constitution undoubtedly intended that New York's free speech clause protect against only state action—and not private conduct. Because the framers of the California Constitution adopted New York's free speech clause almost verbatim, we reasonably conclude they had the same intent as their New York counterparts. (Cf. *Stockton Civic*

*Theatre v. Board of Supervisors* (1967) 66 Cal.2d 13, 21 [56 Cal.Rptr. 658, 423 P.2d 810] [finding that statutory language taken verbatim from a constitutional provision must be given the same meaning as the language in the constitutional provision "unless a clear legislative intent to the contrary appears"].)

This conclusion follows logically from the mindset of the framers of the 1849 California Constitution during its drafting. General Bennett Riley issued the call for the 1849 convention "for the purpose of providing such a government as California might need." (Coy & Jones, California's Constitution (1930) p. 12; see also Browne, *supra,* at pp. 3-4.) Thus, the framers of the 1849 California Constitution were focused on defining the scope of the *government's* power. Consistent with this focus, various delegates observed that the Constitution should protect against governmental action. (See, e.g., Browne, *supra,* at pp. 92, 130 ["the object of this Convention is to limit the powers of the Legislature"; "We are guarding here against bad Legislatures"].) As a result, the California "Constitution of 1849 was not a grant of power to the Legislature but a *limitation* upon it." (Conmy, The Constitutional Beginnings of California (1959) p. 23, fn. 48, italics added.) "It is abundantly clear that the draftsmen of the 1849 and 1879 constitutions regarded the California Constitution as the principal bulwark protecting the liberties of Californians *from governmental encroachment.*" (Grodin et al., The Cal. State Constitution (1993) p. 21, italics added.)

In any event, our extensive review of the history behind the adoption of California's free speech clause reveals *no* evidence suggesting that the framers intended to protect against private encroachments. The lack of such evidence is hardly surprising given the prevailing perception of state constitutions in 1849, as expounded by the United States Supreme Court: "Each state established a constitution for itself, and in that constitution, provided such limitations and restrictions *on the powers of its particular government,* as its judgment dictated." (*Barron v. City Council of Baltimore* (1833) 32 U.S. 243, 247 [8 L.Ed. 672, 674], italics added.) Indeed, "common law and civil law" historically "regulate[d] *private conduct,*" while constitutional law regulated "public or governmental conduct." (*California's Right to Privacy, supra,* 19 Pepperdine L.Rev. at p. 409, italics added.) Thus, "[i]t would . . . be natural to expect that a declaration of rights contained in a state constitution pertains primarily to restrictions upon what the state may do to its citizens." (*Id.* at p. 407, fn. omitted.) Based on the historical evidence suggesting that the framers of California's free speech clause intended to protect against governmental—and not private—encroachments, and the absence of any evidence to the contrary, we see no grounds for reaching a

different conclusion. (See *Gay Law Students Assn., supra*, 24 Cal.3d at p. 468.)

*Robins* does not alter our conclusion. Contrary to the dissent's unsupported assertion, *Robins* did not necessarily reject a state action limitation. It could have "simply broadened the federal definition of 'state action' to embrace the peculiar facts of the case." (*Constructing an Alternative, supra*, 21 Rutgers L.J. at p. 832.) Over the past 20 years, numerous commentators have explicitly and implicitly recognized such a possibility and noted that *Robins* left open the issue of whether California's free speech clause required state action.[8]

Indeed, our refusal to abandon the state action requirement is fully consonant with *Robins*. Although *Robins* did not address the state action issue, it did rely heavily on California cases applying the pre-*Lloyd* decisions of the United States Supreme Court (*Robins, supra*, 23 Cal.3d at pp. 908-909)—which, as *Robins* itself recognized, imposed a state action requirement (*id.* at p. 904). Moreover, the reasoning of *Robins* bears a "close similarity" to the reasoning of the United States Supreme Court in *Logan Plaza*. (*Pruneyard Shopping Center, supra*, 57 Chi.-Kent L.Rev. at p. 389.) Finally, *Diamond v. Bland* (1970) 3 Cal.3d 653, 666, fn. 4 [91 Cal.Rptr. 501, 477 P.2d 733] (*Diamond I*), one of the decisions cited as persuasive authority in *Robins*, expressly acknowledged the need for state action in order to trigger constitutional free speech protections. Thus, *Robins* is wholly consistent with a state action requirement. (See *California's Right to Privacy, supra*, 19 Pepperdine L.Rev. at p. 413; *Free Speech Access to Shopping Centers, supra*, 68 Cal. L.Rev. at p. 665.)

Our recent statement in *Gerawan* that California's free speech clause "runs against the world, including private parties as well as governmental actors" does not dictate a contrary result. (*Gerawan, supra*, 24 Cal.4th at p. 492.) In *Gerawan*, we considered "whether a marketing order issued by the Secretary of Food and Agriculture of the State of California implicates any right to freedom of speech under either the First Amendment or article I by compelling funding of generic advertising." (*Id.* at p. 476.) Because the presence of a state actor was undisputed, we did not carefully consider

---

[8](See *Private Property, Public Property, supra*, 62 Alb. L.Rev. at pp. 1238-1239; *California's Right to Privacy, supra*, 19 Pepperdine L.Rev. at p. 413; *Pruning Pruneyard, supra*, 24 U.C. Davis L.Rev. at p. 1090; *Constructing an Alternative, supra*, 21 Rutgers L.J. at p. 832; *A Terrible Beauty, supra*, 9 Whittier L.Rev. at p. 731; *State Constitutional Rights of Free Speech, supra*, 18 Gonz. L.Rev. at pp. 94-95; *Free Speech Access to Shopping Centers, supra*, 68 Cal. L.Rev. at p. 645; see also *Laguna Publishing, supra*, 131 Cal.App.3d at p. 838 [declining to interpret *Robins* as rejecting a state action limitation].)

whether California's free speech clause requires state action. Therefore, the language in *Gerawan* suggesting that our free speech clause protects against private action is nonbinding dictum. (See *Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 [71 Cal.Rptr.2d 830, 951 P.2d 399] [A decision "is not authority for everything said in the . . . opinion but only 'for the points actually involved and actually decided' "].) The absence of any analysis renders this dictum unpersuasive. (See *People v. Mendoza* (2000) 23 Cal.4th 896, 915 [98 Cal.Rptr.2d 431, 4 P.3d 265] [" 'we must view with caution seemingly categorical directives not essential to earlier decisions and be guided by this dictum only to the extent it remains analytically persuasive' "].) In any event, the express repudiation of this language by one of the four signatories to *Gerawan* removes any impediment to reaching a different conclusion based on our careful consideration of the clause's text and history here.

Nor does our decision in *Hill* to reject a state action limitation on California's privacy clause compel a different result. Our decision in *Hill* was based *solely* on the official ballot pamphlet—which clearly contemplated that the constitutional right to privacy "may be enforced against private parties . . . ." (*Hill, supra,* 7 Cal.4th at p. 18; see *id.* at pp. 16-18, 19.) In contrast, the history behind California's free speech clause contains no such indication and strongly suggests the contrary. (See *ante,* at pp. 1024-1028.)

Likewise, the existence of a clause in the 1849 Constitution granting wives a separate property right against their husbands does not support the rejection of a state action limitation. (Cal. Const. of 1849, art. XI, § 14.) Unlike the free speech clause, section 14 of article XI was not part of the Declaration of Rights—which historically set forth general principles of governance and established limitations on governments, not private individuals. (See *California's Right to Privacy, supra,* 19 Pepperdine L.Rev. at p. 407.) Because the marital property rights provision is more analogous to particularized legislation, literal adherence to the words of that provision may be sufficient. However, where, as here, the constitutional provision announces a broad principle of government, we necessarily look beyond the text and consider the context and history of that provision. (See, e.g., *Gay Law Students Assn., supra,* 24 Cal.3d at pp. 468-469; *Kruger v. Wells Fargo Bank* (1974) 11 Cal.3d 352, 366-367 [113 Cal.Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 1266].) Thus, the existence of the marital property rights provision does not make irrelevant the fact that California's free speech clause derives almost verbatim from a clause in the New York Constitution with a state action limitation. (See *ante,* at pp. 1025-1026.)

Finally, including a state action limitation comports with the decisions of most of our sister courts. (See *State Constitutions and Protection of Freedom of Expression, supra,* 33 U. Kan. L.Rev. at p. 318 ["The notion that free expression can, and potentially does, mean something slightly different in each state even when provisions read identically is not fully supportable"].) Virtually every state court construing a state constitutional provision with language similar to California's free speech provision has found a state action requirement.[9] Although their reasoning varies somewhat, they all explicitly or implicitly invoke the venerable principle that "[s]tate constitutions . . . serve as limitations on the otherwise plenary power of state governments." (*Woodland, supra,* 378 N.W.2d at p. 347.) Under this principle, "the fundamental nature of a constitution is to govern the relationship between the people and their government, not to control the rights of the people vis-à-vis each other." (*Southcenter Joint Venture, supra,* 780 P.2d at p. 1286, fn. omitted.)

Like our sister courts, we recognize that this careful differentiation between government and private conduct has been a hallmark of American constitutional theory since the birth of our nation and serves two important purposes. First, this demarcation is necessary to preserve private autonomy. "[B]y exempting private action from the reach of the Constitution's prohibitions, [the state action limitation] stops the Constitution short of preempting individual liberty—of denying to individuals the freedom to make certain choices. . . . Such freedom is basic under any conception of liberty, but it would be lost if individuals had to conform their conduct to the Constitution's demands." (Tribe, American Constitutional Law (2d ed. 1988) p. 1691.)

Second, a state action limitation safeguards the separation of powers embodied in every American constitution by recognizing the limited ability of courts "to accomplish goals which are essentially legislative and political." (*Woodland, supra,* 378 N.W.2d at p. 347.) "Without a state action

---

[9](See, e.g., *Fiesta Mall Venture, supra,* 767 P.2d at p. 723 [holding that the state free speech clause did not restrain private conduct]; *Cologne, supra,* 469 A.2d at p. 1209 [same]; *Cahill, supra,* 519 S.E.2d at p. 450 [same]; *State v. Lacey* (Iowa 1991) 465 N.W.2d 537, 540 [same]; *Eastwood Mall, supra,* 626 N.E.2d at p. 61 [same]; *People v. DiGuida* (1992) 152 Ill.2d 104 [178 Ill.Dec. 80, 604 N.E.2d 336, 344] [same]; *Woodland, supra,* 378 N.W.2d at p. 348 [same]; *Wicklund, supra,* 589 N.W.2d at p. 801 [same]; *S.O.C., supra,* 23 P.3d at p. 251 [same]; *SHAD Alliance, supra,* 488 N.E.2d at p. 1214, fn. 5 [same]; *Western Pennsylvania Socialist Workers v. Connecticut General Life Ins. Co.* (1986) 512 Pa. 23 [515 A.2d 1331, 1335] [same]; *Southcenter Joint Venture, supra,* 780 P.2d at p. 1292 [same]; *Jacobs, supra,* 407 N.W.2d at p. 841 [same]; but see *New Jersey Coalition Against War, supra,* 650 A.2d at p. 771 [holding that "the State right of free speech is protected . . . from unreasonably restrictive and oppressive conduct by private entities"].)

limitation, the courts will possess the same authority as the legislature to limit individual freedoms, but will lack the degree of accountability which should accompany such power." (*Post-Pruneyard Access*, *supra*, 30 Wayne L.Rev. at p. 117.) As a result, absent a state action requirement, "the 'rule of law' would approach in Sir Ivor Jennings' caustic but realistic phrase, 'rule by the judges alone.' " (Harvey, *Private Restraint of Expressive Freedom: A Post-Pruneyard Assessment* (1989) 69 B.U. L.Rev. 929, 967, fn. omitted (*Private Restraint*).) Indeed, "[i]t is not the role of [courts] to strike precise balances among the fluctuating interests of competing private groups which then become rigidified in the granite of constitutional adjudication." (*Cologne*, *supra*, 469 A.2d at p. 1210.)

Neither the text of California's free speech clause nor our case law reveals an intent to depart from these bedrock principles of constitutional jurisprudence. At the same time, the history behind the clause supports the inclusion of a state action limitation and contains *nothing* even suggesting a contrary possibility. Accordingly, we hold that article I, section 2, subdivision (a) only protects against state action.[10] (See *Gay Law Students Assn.*, *supra*, 24 Cal.3d at p. 468.)

### III

Of course, finding a state action limitation does not end our inquiry. We must still determine the scope of this limitation. *Robins* established that state action for purposes of California's free speech clause is not the same as state action for purposes of the First Amendment. (See *Robins*, *supra*, 23 Cal.3d at pp. 905-906 [federal free speech decisions do not preclude a different result under the California Constitution].) In particular, California's free speech clause, unlike its federal counterpart, runs against certain privately owned shopping centers. (Compare *Robins*, *supra*, 23 Cal.3d at p. 910, with *Hudgens*, *supra*, 424 U.S. at pp. 519-520 [96 S.Ct. at pp. 1036-1037].) *Robins* did not, however, define the requisite state action or delineate the scope of free speech rights recognized by the California Constitution. Today, we take the first step in rectifying this situation and conclude that no state action exists here because the Complex is not freely open to the public.

Although *Robins* did not mention state action and did not clearly define the scope of California's free speech clause, we can still look to its reasoning for guidance. To support its holding that the California Constitution protects

---

[10]Contrary to the dissent's characterization (see dis. opn., *post*, at pp. 1057-1058), Chief Justice George expressly declines to reach the state action question and expresses no opinion as to whether California's free speech clause requires state action (see conc. opn., *post*, at pp. 1041-1042).

free speech in a privately owned shopping center, *Robins* relied heavily on the functional equivalence of the shopping center to a traditional public forum—the " ' "downtown[]" ' " or "central business district[]." (*Robins, supra,* 23 Cal.3d at pp. 910, fn. 5, 907; *id.* at pp. 910-911.) In finding this functional equivalence, *Robins* emphasized, among other things, the shopping center's open and unrestricted invitation to the public to congregate freely. (See *id.* at pp. 909-910.) Indeed, *Robins* implicitly exempted " 'an individual homeowner' " from the purview of California's free speech clause, presumably because individual homes are not freely and openly accessible to the public. (*Id.* at p. 910.) In doing so, *Robins* indicated that the applicability of California's free speech clause depends in part on the public character of the property.

The importance of the public character of the property in determining the scope of California's free speech clause derives support from *Robins*'s reference to earlier California decisions finding a right to free speech on private property. Although all of these cases relied on the First Amendment and the pre-*Lloyd* decisions of the United States Supreme Court—*Marsh v. Alabama* (1946) 326 U.S. 501 [66 S.Ct. 276, 90 L.Ed. 265] (*Marsh*) and *Logan Plaza, supra,* 391 U.S. 308[11]—*Robins* found many of the principles enunciated in these cases persuasive in interpreting California's free speech clause. (See *Robins, supra,* 23 Cal.3d at pp. 908-909.) One such principle emphasized by *Robins* was the public's unrestricted access to the privately owned property.[12] (See *Robins,* at pp. 909-910.)

Indeed, the reference in *Robins* to California cases relying on *Marsh* and *Logan Plaza* suggests an implicit approval of the reasoning in these federal decisions. (See *Pruneyard Shopping Center, supra,* 57 Chi.-Kent L.Rev. at p. 384 [noting that *Robins* "resurrect[ed] the rationale of *Logan* [*Plaza*]"].) Because both *Marsh* and *Logan Plaza* partially relied on the public's unrestricted access in extending the reach of the First Amendment to certain

[11](See *Diamond I, supra,* 3 Cal.3d at p. 661 [relying on the First Amendment and *Logan Plaza*]; *In re Lane* (1969) 71 Cal.2d 872, 878 [79 Cal.Rptr. 729, 457 P.2d 561] (*Lane*) [same]; *In re Hoffman* (1967) 67 Cal.2d 845, 849-850 [64 Cal.Rptr. 97, 434 P.2d 353] (*Hoffman*) [relying on the First Amendment and *Marsh*]; *Schwartz-Torrance Investment Corp. v. Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766, 771 [40 Cal.Rptr. 233, 394 P.2d 921] (*Schwartz-Torrance*) [relying on *Marsh* and other First Amendment precedents].)

[12](See *Diamond II, supra,* 11 Cal.3d 331, 342-343 (dis. opn. of Mosk, J.) [emphasizing the public's unrestricted access to the shopping center]; *Diamond I, supra,* 3 Cal.3d at pp. 659-660 [same]; *Lane, supra,* 71 Cal.2d at pp. 877-878 [emphasizing the public nature of the sidewalk and store]; *Hoffman, supra,* 67 Cal.2d at pp. 847, 851 [emphasizing that the railway station was open to the public and contained a "spacious area" with numerous retail establishments where the public could and would congregate]; *Schwartz-Torrance, supra,* 61 Cal.2d at pp. 768, 772 [emphasizing the public nature of the shopping center].)

privately owned properties, they bolster the conclusion that private property must be public in character before California's free speech clause may apply. For example, *Marsh* held that a sidewalk in the business district of a privately owned town may be treated as publicly owned property for First Amendment purposes based, in part, on the public's unrestricted access to the town's business district. (*Marsh, supra*, 326 U.S. at pp. 508-509 [66 S.Ct. at pp. 279-280].) "The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." (*Id.* at p. 506 [66 S.Ct. at p. 278].) Similarly, *Logan Plaza* held that a shopping mall should be treated as publicly owned for First Amendment purposes because, among other things, the public had "unrestricted access to the mall property." (*Logan Plaza, supra*, 391 U.S. at pp. 318, 321, 325 [88 S.Ct. at pp. 1608, 1609-1610, 1612].)

In light of the above, we conclude that the actions of a private property owner constitute state action for purposes of California's free speech clause only if the property is freely and openly accessible to the public. By establishing this threshold requirement for establishing state action, we largely follow the Court of Appeal decisions construing *Robins*. For example, our Courts of Appeal have consistently held that privately owned medical centers and their parking lots are not functionally equivalent to a traditional public forum for purposes of California's free speech clause because, among other things, they are not freely open to the public. (See, e.g., *Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641, 1661 [39 Cal.Rptr.2d 189] (*Blythe*); *Allred v. Harris* (1993) 14 Cal.App.4th 1386, 1392-1393 [18 Cal.Rptr.2d 530]; *Planned Parenthood v. Wilson* (1991) 234 Cal.App.3d 1662, 1672 [286 Cal.Rptr. 427]; *Allred v. Shawley* (1991) 232 Cal.App.3d 1489, 1504-1505 [284 Cal.Rptr. 140].) Our lower courts have also suggested that an apartment complex does not resemble a traditional public forum because it "is a place where the public is generally excluded." (*Cox Cable San Diego, Inc. v. Bookspan, Inc.* (1987) 195 Cal.App.3d 22, 29 [240 Cal.Rptr. 407].)

Here, the Complex is privately owned, and Golden Gateway, the owner, restricts the public's access to the Complex. In fact, Golden Gateway carefully limits access to residential tenants and their invitees. Thus, the Complex, unlike the shopping center in *Robins*, is not the functional equivalent of a traditional public forum. Accordingly, Golden Gateway's actions do not constitute state action for purposes of California's free speech, and the

Tenants Association has no right to distribute its newsletter pursuant to article I, section 2, subdivision (a).[13]

In reaching this conclusion, we note that judicial enforcement of injunctive relief does not, by itself, constitute state action for purposes of California's free speech clause. Although the United States Supreme Court has held that judicial effectuation of a racially restrictive covenant constitutes state action (see *Shelley v. Kraemer* (1948) 334 U.S. 1, 20 [68 S.Ct. 836, 845-846, 92 L.Ed. 1161, 3 A.L.R.2d 441]), it has largely limited this holding to the facts of those cases (Cole, *Federal and State "State Action": The Undercritical Embrace of a Hypercriticized Doctrine* (1990) 24 Ga. L.Rev. 327, 353). We therefore decline to extend it to this particular case, where the private property owner merely seeks judicial enforcement of a neutral lease provision.[14] Indeed, a contrary holding would effectively eviscerate the state action requirement because private property owners, for the most part, enforce their property rights through court actions. We also see no basis for conditioning a finding of state action on whether a party invokes California's free speech clause as a sword or a shield. Therefore, we decline to follow the dictum in *Blythe, supra,* 32 Cal.App.4th at page 1665 ("Free speech concerns may be raised as a shield against injunctive relief only because the effectuation of such relief entails government action").

*Martin v. City of Struthers* (1943) 319 U.S. 141 [63 S.Ct. 862, 87 L.Ed. 1313] and *Van Nuys Pub. Co. v. City of Thousand Oaks* (1971) 5 Cal.3d 817 [97 Cal.Rptr. 777, 489 P.2d 809] are also inapposite. Although *Martin* and *Van Nuys* found the prohibition of door-to-door leafletting to private residences unconstitutional, both cases involved municipal ordinances enacted by a governmental entity. (*Martin,* at p. 142 [63 S.Ct. at pp. 862-863]; *Van Nuys,* at p. 819.) Here, the owner of the Complex is a *private* entity, and its actions do not constitute state action. (See *ante,* at pp. 1033-1034.)

---

[13]Consequently, we do not reach the issue of whether Golden Gateway's ban on leafletting is a reasonable time, place and manner restriction on free speech.

[14](See, e.g., *Linn Valley Lakes Property Owners Assn. v. Brockway* (1992) 250 Kan. 169 [824 P.2d 948, 951] [judicial enforcement of a constitutionally permissible restrictive covenant is not state action]; *Midlake on Big Boulder Lake v. Cappuccio* (1996) 449 Pa. Super. 124 [673 A.2d 340, 342] [same]; *Washington v. Noah* (2000) 103 Wash.App. 29 [9 P.3d 858, 870] [judicial enforcement of a voluntary settlement agreement is not state action]; cf. *CompuServe Inc. v. Cyber Promotions, Inc.* (S.D. Ohio 1997) 962 F.Supp. 1015, 1026 ["the mere judicial enforcement of neutral trespass laws by the private owner of property does not alone render it a state actor"]; *Commonwealth v. Hood* (1983) 389 Mass. 581 [452 N.E.2d 188, 193] [judicial enforcement of neutral trespass statute is not state action]; but see *Franklin v. White Egret Condominium* (Fla.Dist.Ct.App. 1977) 358 So.2d 1084, 1087-1088 [finding enforcement of a restrictive covenant barring children under the age of 12 unconstitutional], affd. *White Egret Condominium v. Franklin* (Fla. 1979) 379 So.2d 346; *West Hill Baptist Church v. Abbate* (1969) 24 Ohio Misc. 66 [53 Ohio Ops.2d 107, 261 N.E.2d 196, 200] [judicial enforcement of restrictive covenant excluding houses of worship constitutes state action].)

Likewise, defendant's reliance on *Inganamort v. Merker* (1977) 148 N.J.Super. 506 [372 A.2d 1168] is misplaced. *Inganamort* only held that tenants had the right to distribute noncommercial written material in an apartment building pursuant to their leaseholds under New Jersey law. (*Id.* at p. 1170.) It did not consider any constitutional right to free speech. Moreover, the New Jersey Supreme Court has declined to impose a state action limitation on the free speech clause of New Jersey's Constitution. (*New Jersey Coalition Against War, supra,* 650 A.2d at p. 771.) Therefore, New Jersey decisions are not relevant to our interpretation of the California Constitution.

Finally, *Laguna Publishing, supra,* 131 Cal.App.3d 816, is distinguishable. In *Laguna Publishing,* the Court of Appeal found the discriminatory enforcement of a ban on distributing commercial newspapers in a private, gated community unconstitutional. (*Id.* at p. 844.) In contrast, the instant case does not involve a discriminatory limitation on speech activities. Because this case does not raise the same issue raised in *Laguna Publishing,* we decline to address it here and leave its resolution for another day.

In closing, we emphasize that our decision today does not give apartment owners carte blanche to stifle tenant speech. Tenants may still have remedies under conventional property law principles. (See Lobsenz & Swanson, *The Residential Tenant's Right to Freedom of Political Expression* (1986) 10 U. Puget Sound L.Rev. 1, 45.) Moreover, many statutes and ordinances serve to protect tenants against unreasonable lease provisions and restrictions. (See, e.g., Civ. Code, §§ 1942.5, 1942.6, 1953.) Finally, tenants may always seek a legislative solution tailored to their particular concerns. Indeed, "[t]he common law and statutes are always sufficient if a state court has the desire and will to protect private rights from private infringement." (*California's Right to Privacy, supra,* 19 Pepperdine L.Rev. at p. 409.) Our decision today merely seeks to avoid "rigid rectitude in stultifying, imposed uniformity" by declining to constitutionalize a private dispute. (*Private Restraint, supra,* 69 B.U. L.Rev. at p. 969.)

DISPOSITION

We affirm the judgment of the Court of Appeal.

Baxter, J., and Chin, J., concurred.

**GEORGE, C. J.**—I concur in the determination that article I, section 2, subdivision (a) of the California Constitution (section 2(a) or the free speech clause) does not afford defendant tenants association a right to distribute

unsolicited pamphlets in the interior hallways of privately owned apartment buildings from which the general public is excluded.

As I shall explain, the particular category of free speech claim here at issue—the right to *distribute unsolicited pamphlets* on another's property—is applicable only with respect to locations that, whether publicly or privately owned, are freely open to the general public. Because a recognition of the appropriate limit of this substantive right of free speech is sufficient in itself to resolve this case, I believe it is unnecessary to reach out to decide the much broader question of whether section 2(a)'s right of "[e]very person [to] freely speak, write and publish his or her sentiments on all subjects" affords individuals, *as a general matter and in all circumstances*, protection against *only* "state action" and not against the conduct or actions of private parties.

Neither the parties nor the lower courts focused upon the broad issue of whether the state constitutional free speech clause applies, as a general matter, only to state action, and there is no reason to undertake to resolve that question here. Even if the apartment complex at issue had been publicly owned (and thus the state action doctrine clearly satisfied), the state constitutional right of free speech would not extend to the unsolicited distribution of pamphlets in the interior hallways of an apartment building that is not generally open to the public. Accordingly, although I concur in the judgment, I do not join the lead opinion's discussion or conclusions with regard to the state action doctrine.

## I.

More than a half-century ago, the New York Court of Appeals, in *Watchtower Bible & Tract Soc., Inc. v. Metropolitan Life Ins. Co.* (1948) 297 N.Y. 339 [79 N.E.2d 433, 3 A.L.R.3d 1423] (*Watchtower*), unanimously declined to recognize either a state or federal constitutional right to solicit or distribute unsolicited pamphlets in the closed areas of a large private apartment complex. The court in *Watchtower* observed that "[a] narrow inner hallway on an upper floor of an apartment house is hardly an appropriate place at which to demand the free exercise of" such rights (*id.*, at p. 436), and that "no case we know of extends the reach of the Bill of Rights so far as to proscribe the reasonable regulation, by an owner, of conduct *inside* his multiple dwelling." (*Id.*, at pp. 436-437, italics added.) Likewise, no decision of which I am aware, before or since *Watchtower*, has recognized a constitutional right to distribute unsolicited pamphlets in the closed interior hallways of privately owned apartment buildings or, for that matter, in any other analogous area that is closed to the general public.

The United States Supreme Court has found a First Amendment free speech right to picket or distribute literature on public streets and sidewalks, and in doing so it has emphasized the open nature of those locations as a basis for its conclusion. (E.g., *Thornhill v. Alabama* (1940) 310 U.S. 88, 105-106 [60 S.Ct. 736, 745-746, 84 L.Ed. 1093] (*Thornhill*); see also *Hague v. C.I.O.* (1939) 307 U.S. 496, 515-516 [59 S.Ct. 954, 963-964, 83 L.Ed. 1423] [public streets and parks have been traditional grounds for exercise of free expression]; *Lovell v. Griffin* (1938) 303 U.S. 444 [58 S.Ct. 666, 82 L.Ed. 949] [finding First Amendment right to distribute religious pamphlets on public sidewalks].) In *Marsh v. Alabama* (1946) 326 U.S. 501 [66 S.Ct. 276, 90 L.Ed. 265] (*Marsh*), the high court extended this rule to the business district of a private "company town." The court in *Marsh* found a free speech right to distribute religious literature, and emphasized that the private town's business district was "freely accessible and open" to the public. (*Id.*, at p. 508 [66 S.Ct. at p. 279].)[1]

In *Schwartz-Torrance Investment Corp. v. Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921] (*Schwartz-Torrance*), this court, citing *Thornhill* and *Marsh*, found a right to peacefully picket at a privately owned shopping center. In so concluding, we emphasized the public nature of the shopping center (*Schwartz-Torrance, supra*, at pp. 772-773, and cases cited) and distinguished *Labor Board v. Babcock & Wilcox Co.* (1956) 351 U.S. 105 [76 S.Ct. 679, 100 L.Ed. 975], in which the high court upheld an employer's right to prohibit picketing in a company parking lot. We explained: "Unlike the . . . property in the present case, the Babcock & Wilcox parking lot was not generally open to the public." (*Schwartz-Torrance, supra*, 61 Cal.2d at p. 774.)

Subsequently, in *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353], we found a right to peacefully and unobtrusively distribute leaflets protesting the Vietnam War, in the privately owned Union Station of Los Angeles. In reaching our conclusion we emphasized that the railway station was a "spacious area open to the community as a center for rail transportation" (*id.*, at p. 847) and that in this respect it was analogous to a "public street or park" (*id.*, at p. 851).

Consistently with *Schwartz-Torrance,* in *Food Employees v. Logan Plaza* (1968) 391 U.S. 308 [88 S.Ct. 1601, 20 L.Ed.2d 603] (*Logan Plaza*), the

---

[1]The court observed: "The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. [Citation.] Thus, the owners of privately held bridges, ferries, turnpikes and railroads may not operate them as freely as a farmer does his farm. Since these facilities are built and operated primarily to benefit the public and since their operation is essentially a public function, it is subject to state regulation." (*Marsh, supra,* 326 U.S. at p. 506 [66 S.Ct. at p. 278].)

high court found a free speech right to peacefully picket and distribute handbills in a privately owned shopping mall, and in so concluding emphasized the public's "virtually unrestricted access" to the mall property. (*Id.*, at p. 321 [88 S.Ct. at p. 1610]; see also *id.*, at pp. 313, 325 [88 S.Ct. at pp. 1605-1606, 1612].) The court in *Logan Plaza* observed that in circumstances in which "property is *not* ordinarily open to the public, this Court has held that access to it for the purpose of exercising First Amendment rights may be denied altogether." (*Id.*, at p. 320 [88 S.Ct. at p. 1609], italics added.)[2]

In *In re Lane* (1969) 71 Cal.2d 872 [79 Cal.Rptr. 729, 457 P.2d 561], we found a right to peacefully distribute labor union handbills on a private sidewalk abutting a large "stand alone" supermarket. In so concluding we cited and followed the above cases and emphasized that the private sidewalk was "open to the public" and that "[t]he public is openly invited to use it." (*Id.*, at p. 878.)

*Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341] (*Robins*), affirmed *sub nomine Pruneyard Shopping Center v. Robins* (1980) 447 U.S. 74 [100 S.Ct. 2035, 64 L.Ed.2d 741], followed this same approach, finding a right under section 2(a) to seek petition signatures and to speak with patrons on a matter of public interest in a privately owned shopping center. Our decision in *Robins* emphasized that the center was freely open to the public (*Robins, supra*, 23 Cal.3d at pp. 902, 909-911), and indeed we implicitly exempted " 'an individual homeowner' " from our holding (*id.*, at p. 910), presumably, as the lead opinion notes, "because individual homes are not freely and openly accessible to the public." (Lead opn., *ante*, at p. 1032.)

California decisions filed since *Robins*, finding a state constitutional free speech right to distribute pamphlets or to picket, have continued to emphasize the open nature of the location where the rights were to be exercised. (E.g., *Sears, Roebuck & Co. v. San Diego District Council of Carpenters* (1979) 25 Cal.3d 317, 328, 332 [158 Cal.Rptr. 370, 599 P.2d 676] [upholding union's free speech right to picket on employer's privately owned sidewalks surrounding its store; court emphasized that the sidewalk was open to the general public and was a "traditional and accepted place where unions may, by peaceful picketing, present to the public their views respecting a labor dispute with that store"]; *Prisoners Union v. Department of Corrections* (1982) 135 Cal.App.3d 930, 932 [185 Cal.Rptr. 634] [recognizing the right to distribute pamphlets in a prison parking lot "open to

---

[2]The high court reversed *Logan Plaza* in *Hudgens v. NLRB* (1976) 424 U.S. 507 [96 S.Ct. 1029, 47 L.Ed.2d 196].

members of the general public"]; *Westside Sane/Freeze v. Ernest W. Hahn, Inc.* (1990) 224 Cal.App.3d 546, 552-556 [274 Cal.Rptr. 51] [upholding political group's free speech right to distribute leaflets at a privately owned shopping center; court asserted that the shopping center, to which the public was invited, was a public forum for exercising free speech rights]; see also *Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 363, 364 [93 Cal.Rptr.2d 1, 993 P.2d 334] [ordinance that regulated and banned solicitation of funds in "public places," including sidewalks, bus stops, and restaurants, "plainly implicate[d]" section 2(a)'s free speech right].)

Sister state decisions that have found a state constitutional free speech right to distribute pamphlets in private shopping centers likewise have stressed the open and public nature of the forum. (See *Bock v. Westminster Mall Co.* (Colo. 1991) 819 P.2d 55, 61-63; *New Jersey Coalition Against War v. J.M.B. Realty Corp.* (1994) 138 N.J. 326 [650 A.2d 757, 771-774, 52 A.L.R.5th 777].) Similarly, state court decisions that have recognized other state constitutional rights (distinct from a free speech right) to solicit signatures at private shopping centers also have emphasized the open and public nature of the forum. (See *Batchelder v. Allied Stores Intern., Inc.* (1983) 388 Mass. 83 [445 N.E.2d 590, 595, 38 A.L.R.4th 1206] (*Batchelder*) [finding right to solicit signatures under state constitution's "freedom and equality of elections" provision];[3] *Alderwood Associates v. Washington Environmental Council* (Wash. 1981) 635 P.2d 108, 116-117 (*Alderwood*) [finding right to solicit signatures under state constitution's initiative provision].)[4]

As these decisions suggest, the acts of distributing unsolicited pamphlets, picketing, and soliciting signatures or funds traditionally are performed in places open to the general public—that is, in places sometimes referred to as public forums.[5] In light of this tradition, when one speaks of a "constitutional right" to engage in such conduct, one cannot reasonably have in mind

[3]The court in *Batchelder* observed: "We are not discussing signature solicitations *in* stores but only unobtrusive and reasonable solicitations in the common areas of the mall, areas that have been dedicated to the public as a practical matter." (*Batchelder, supra*, 445 N.E.2d at p. 595, italics added.)

[4]In *Southcenter v. National Dem. Policy Comm.* (1989) 113 Wash.2d 413 [780 P.2d 1282, 1290], the Washington Supreme Court subsequently reaffirmed this aspect of *Alderwood*, while at the same time rejecting other facets of that decision.

[5]Decisions upholding a right to distribute pamphlets door-to-door (e.g., *Martin v. City of Struthers* (1943) 319 U.S. 141 [63 S.Ct. 862, 87 L.Ed. 1313]; *Van Nuys Pub. Co. v. City of Thousand Oaks* (1971) 5 Cal.3d 817 [97 Cal.Rptr. 777, 489 P.2d 809]) recognize that unless the occupant of a dwelling announces a desire not to receive unsolicited material, members of the general public are permitted to traverse a private walkway, and leave pamphlets on or near any dwelling door that is located in an area not closed to the general public. Accordingly, in

an asserted right to invade the *interior hallways* of a private business structure, home, or apartment complex, in order to proffer an unsolicited flier, placard or petition. Under the foregoing decisions, there is no state or federal constitutional right to *distribute unsolicited pamphlets* in a location (whether publicly or privately owned) not open to the general public, such as the closed interior hallways of the apartment buildings here at issue. (*Watchtower, supra,* 79 N.E.2d 433, 436-437, quoted *ante,* at p. 1036; *Hall v. Virginia* (1948) 188 Va. 72 [49 S.E.2d 369, 375-378] [there is no constitutional right to distribute unsolicited pamphlets in the interior hallways of an apartment complex]; Annot., Right of Owner of Housing Development or Apartment Houses to Restrict Canvassing, Peddling, Solicitation of Contributions, etc. (1949) 3 A.L.R.2d 1431, 1432-1433 ["[R]egulations of . . . apartment house owners, which have the effect of restricting . . . solicitation, etc., will not be held . . . unconstitutional as violating constitutional guaranties of others to freedom of religion, speech, or press, where the activities are curtailed in places . . . not public or quasi-public in nature, and where the rights of persons to privacy in their dwelling places are protected from infringement by such regulations"]; see also *Batchelder, supra,* 445 N.E.2d 590, 595, quoted *ante,* at fn. 3.)

In the case now before us, the landlord has limited hallway access to residential tenants and their invitees, and has excluded the general public. Accordingly, this case is quite different from *Robins, supra,* 23 Cal.3d 899, and the other free speech cases discussed above. A free speech right to distribute unsolicited pamphlets *in places open to the general public* simply is not triggered on the facts presented.

It is thus apparent that the state action doctrine is irrelevant to this case. Had the apartment complex been owned by the state and had the apartment

---

situations contemplated in those decisions, unlike the present case, the area leading to and immediately surrounding the door is *not* closed to the general public.

*Laguna Publishing Co. v. Golden Rain Foundation* (1982) 131 Cal.App.3d 816 [182 Cal.Rptr. 813] (*Laguna Publishing Co.*) is distinguishable from the present case. In that case, a newspaper publisher was barred by the homeowners association of a private gated community from entering the community and depositing unsolicited copies of its free newspaper at the doors of the residents of the community. At the same time, the association permitted another newspaper publisher to deliver its competing free and unsolicited newspaper to the doors of the community residents. The excluded publisher sued in order to establish its right to distribute on an equal footing with the preferred publisher. Although the Court of Appeal found that the excluded publisher had a right under article 2(a) to distribute its newspapers to the doors of the community residents on an equal basis with the other publisher, that court's decision rested upon the discriminatory nature of the challenged policy. (See *Laguna Publishing Co., supra,* at pp. 840-845.) The Court of Appeal in *Laguna Publishing Co.* concluded that the dispute presented was "purely and simply a discrimination case with substantial economic consequences," and "not one truly involving the resolution of rights of free speech in conflict with the vested rights of private property." (*Id.,* at pp. 847-848, fn. 14.)

been operated in the same manner as here—that is, by restricting access to interior hallways to tenants and their invitees—the tenants *still* would have no section 2(a) free speech right to distribute unsolicited pamphlets in the buildings' interior hallways, because, as noted above, the constitutional right conferred by section 2(a) to distribute unsolicited pamphlets is inapplicable to the interior hallways of apartment buildings that are closed to the general public.

## II.

It is important to emphasize what we do *not* consider or decide in this case. We do not face any effort by a landlord to ban all discourse by tenants in the closed hallways. Tenants remain free to speak with each other in the hallways or elsewhere about anything they wish. Tenants may knock on the doors of other tenants and speak with them. They may telephone or fax each other, or correspond by letter or e-mail. Pursuant to the landlord's rules, they may post fliers on the bulletin boards of the laundry rooms, and they may even, *upon request*, deliver, and leave at the door of another tenant, the very same pamphlets whose intended distribution triggered this case. As relevant here, the landlord's rule simply prohibits the tenants association from leaving *unsolicited* pamphlets on or under the hallway doors of fellow tenants, or in a pile for the taking in the hallway.

Furthermore, although I conclude for the reasons discussed above that the tenants association possesses no *constitutional* right to leave the unsolicited pamphlets here at issue in the hallways or on or under the hallway doors of fellow tenants, it does not necessarily follow that tenants have *no* right of any sort to do so. Tenants in fact may have such rights, depending upon the terms of the applicable lease or a statute, or based upon general principles of landlord-tenant law. (See, e.g., Civ. Code, §§ 1942.5, 1942.6, 1953; Lobsenz & Swanson, *The Residential Tenant's Right to Freedom of Political Expression* (1986) 10 U. Puget Sound L.Rev. 1, 39-41, 45-49.) Because the only issue upon which we granted review is whether the state constitutional right of free speech extends to the distribution of pamphlets in the interior hallways of an apartment building that is not open to the public, we have no occasion to decide whether tenants or a tenants association may derive such a right from some other source.

## III.

There is much to be said for taking an incrementalist approach to appellate decisionmaking, and such jurisprudential considerations apply especially when, as here, we face the significant task of defining the contours of an

aspect of the state constitutional right of free speech that we have not addressed for more than two decades. The analysis set forth above affords a fully adequate basis upon which to resolve this matter, and I believe the court can, and should, leave to another day and another case the difficult task of further defining and clarifying the scope of section 2(a)'s free speech right. I note that one such case, *Waremart, Inc. v. Progressive Campaigns*, review granted March 14, 2001, S094236, already is pending before our court.█

Instead of resolving this case narrowly on the basis of the issue discussed above, the lead opinion proposes to hold that state action or its equivalent must be established in order to raise *any* claim under section 2(a) (lead opn., *ante*, at p. 1031); and further suggests that *"private property must be public in character before California's free speech clause may apply." (Id.,* at p. 1033, italics added.) But even if one were to accept the lead opinion's assertion that a finding of state action or its equivalent is required with regard to the *specific subcategory* of free speech here at issue—the right to distribute unsolicited pamphlets—such a determination would not, in my view, necessarily control *other* types of free speech claims that might be asserted under section 2(a). By proposing to reach the state action issue, and by speaking broadly and asserting that as a general matter, section 2(a) can afford no type of free speech right with regard to a forum that is both privately owned and closed to the general public, the lead opinion says more than it needs to, and more than is supported by our prior decisions.

When, in a future case, this court does address and decide whether, and in what circumstances, section 2(a) should be construed as requiring a showing of state action, it will be helpful to consider the diverse circumstances in which the free speech clause might be implicated. I have in mind circumstances in which a private person or entity may attempt to utilize its power or authority in one sphere to censor or undermine what might be viewed as another individual's "core" free speech rights. Consider a private landlord who, under penalty of eviction, precludes his or her tenants from displaying in the windows of their apartments the campaign poster of a particular political candidate supported by the tenant—or requires the tenants to display in the windows of their homes a poster of the candidate supported by the landlord. Or consider a union or employer that attempts to utilize its power over an individual by precluding certain bumper stickers on vehicles parked in the employer's or union's parking lot, or by requiring that the employee place a certain bumper sticker on his or her vehicle or attend a rally and make a political contribution, unconnected to employment-related issues, in support of a candidate favored by the union or employer but not supported by the employee.

If we were to hold, as the lead opinion broadly would, that *all types of section 2(a) free speech claims* require state action (or its equivalent, shown by establishing that the location where the speech is exercised is the "functional equivalent of a traditional public forum") (lead opn., *ante*, at p. 1033), we effectively would remove any state constitutional obstacle to any such action by a landlord, union, or employer. I see no reason to prejudge the resolution of such questions.

Given the variety of circumstances in which free speech concerns may come into play, and the difficulty of predicting how the presence or absence of a "state action" requirement might affect the practical protection conferred by the free speech right embodied in the California Constitution's free speech clause, I believe we should proceed cautiously and limit our decision to the context presented by the facts before us.

## IV.

I join in the judgment of the court, because I believe that section 2(a) of the California Constitution has no application in the context presented here. I would decide no more.

**WERDEGAR, J., Dissenting.**—A majority of this court, while divided in their reasons for so doing, today join in immunizing from state constitutional scrutiny a commercial residential landlord's suppression of speech among its tenants. Guided by our precedents and the clear language of our state Constitution, I respectfully dissent.

### Background

Plaintiff Golden Gateway Center (Golden Gateway) is landlord of a multibuilding commercial and residential apartment complex containing 1,254 residential units; defendant Golden Gateway Tenants Association (Tenants Association), formed in 1982, is a group of residential tenants in the complex. Golden Gateway incorporates by reference in each of its residential lease agreements certain "Building Standards." Among these, at relevant times through June 1996, was a provision entitled "Soliciting," which read, in its entirety: "Any soliciting within the building is absolutely forbidden. Should a solicitor appear, please notify the Owner so that appropriate action may be taken."

From the time of its formation in 1982 until 1993, the Tenants Association periodically distributed a newsletter on or under the apartment doors of Golden Gateway's residents. For these approximately 11 years, Golden

Gateway did not object to the Tenants Association's leafleting. Golden Gateway, for its part, also distributed papers under residents' doors (and posted them in common areas, such as the elevators), when such modes of communication served its management's needs and interests.

In 1993, citing the Building Standards, Golden Gateway asked the Tenants Association to stop distributing newsletters at tenants' doors. The Tenants Association refused, inter alia, on constitutional free speech grounds, and continued to distribute its newsletters.

In 1996, shortly after the Tenants Association filed a lawsuit against Golden Gateway opposing "hotelization" of the complex and distributed some leaflets critical of Golden Gateway's management, Golden Gateway demanded that the Tenants Association cease "dissemination of politically based material." When the Tenants Association refused, Golden Gateway revised its Building Standards expressly to forbid all "leafleting," stating that any such within the building "is absolutely forbidden" other than "on the bulletin boards located in the laundry rooms" or at the specific request of a tenant. The Tenants Association continued its distribution practices, and Golden Gateway ultimately sought the injunction that is the subject of this litigation. The Tenants Association cross-complained, seeking a declaration that it could continue leafleting at tenants' doors.

The trial court preliminarily enjoined the Tenants Association from leafleting. After trial, however, the court dissolved the injunction, ruling that the Tenants Association had a contractual right to distribute its newsletter at tenants' doors and on laundry room bulletin boards. The Court of Appeal reversed, and we granted review on petition of the Tenants Association.

### Discussion

Our state Constitution provides that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." (Cal. Const., art. I, § 2, subd. (a); hereafter section 2(a) or the state free speech clause.)[1] This unambiguous language should afford California apartment complex dwellers the freedom, subject to reasonable regulation, to communicate in writing with each other on their residential premises, including, as relevant in this case, at each others' front doors, about matters in their common interest as tenants.

---

[1] In its entirety, section 2(a) provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

At the outset, it is important to emphasize the narrowness of the question we are called upon to decide. No question is raised as to whether the Tenants Association or its members have waived their leafleting or other communicative rights. Nor do we have before us a landlord's attempt to curb purely commercial or nontenant activity. Finally, Golden Gateway's property rights are not those " 'of an individual homeowner or the proprietor of a modest retail establishment' " (*Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 910 [153 Cal.Rptr. 854, 592 P.2d 341] (*Robins*), affd. *sub nom. Pruneyard Shopping Center v. Robins* (1980) 447 U.S. 74 [100 S.Ct. 2035, 64 L.Ed.2d 741]). We need not decide today, therefore, what result an appropriate constitutional analysis would generate in such cases. The sole question we face is whether the residents of a large multibuilding apartment community have the right, as against the landlord's wishes, to communicate with each other through the distribution at their front doors of leaflets, subject to reasonable time, place, and manner regulations and the right of any resident who so wishes to opt out of receiving such communications. I would hold that they do.

## I.

In providing that all Californians "may freely speak, write and publish" their sentiments, the framers of the state free speech clause drew no distinction, among those who might seek to obstruct such activities, between state and private actors. They specified instead, in plain language, a right of free speech that runs against both—and protects against interference by either. Thus, as we observed only last year, section 2(a)'s "right to freedom of speech, unlike the First Amendment's, is unbounded in range. It runs against the world, including private parties as well as governmental actors." (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 492 [101 Cal.Rptr.2d 470, 12 P.3d 720] (*Gerawan*), citing *Robins, supra*, 23 Cal.3d at pp. 908-911; Fritz, *More Than "Shreds and Patches": California's First Bill of Rights* (1989) 17 Hastings Const. L.Q. 13, 31; Friesen, *Should California's Constitutional Guarantees of Individual Rights Apply Against Private Actors?* (1989) 17 Hastings Const. L.Q. 111, 118, 119-122 (*Private Actors*).)

Section 2(a) also, as the lead opinion emphasizes, provides that "[a] law may not restrain or abridge liberty of speech or press," thus explicitly prohibiting state legislative, and implicitly prohibiting state executive and judicial, suppression of protected speech. But the latter proviso neither grammatically nor legally qualifies the simple and sweeping free speech guarantee with which section 2(a) begins. Nor, contrary to the lead opinion, does that proviso indicate an intent that the clause as a whole protect against

only state actions (lead opn., *ante,* at pp. 1023-1024). Rather, as the lead opinion concedes and as commentators have observed, that the "express prohibition against a 'law' restraining or abridging free speech" (*id.* at p. ·1023) resides in (and on its face purports to govern) the second sentence, alone, "arguably bolsters such an interpretation" (*ibid.*) of the clause as a whole as would infer "an intent to protect the right to free speech against private intrusions" (*ibid.,* citing *Private Actors, supra,* 17 Hastings Const. L.Q. at pp. 119-121).

In consequence of section 2(a)'s plain language, we consistently have rejected any suggestion that California's free speech clause carries a state action limitation. We first held more than 20 years ago that it carries no such limitation. (*Robins, supra,* 23 Cal.3d at p. 910.)

In *Robins,* we stated "that sections 2 and 3 of article I of the California Constitution protect speech and petitioning, reasonably exercised, in shopping centers *even when the centers are privately owned.*" (*Robins, supra,* 23 Cal.3d at p. 910, italics added.) Although our rejection in *Robins* of a state action requirement was only implicit, the lead opinion is mistaken in asserting we there did not address whether California's free speech clause protects against only state action or against private conduct as well. (Lead opn., *ante,* at p. 1020.) We had no choice *but* to address that issue, as the conduct complained of in *Robins*—a commercial landlord's policy "not to permit any tenant or visitor to engage in publicly expressive activity" (*Robins, supra,* 23 Cal.3d at p. 902)—was "that [of] a *private individual*" (*Laguna Publishing Co. v. Golden Rain Foundation* (1982) 131 Cal.App.3d 816, 838 [182 Cal.Rptr. 813]). We properly treat courts' implicit holdings as equivalent, legally and logically, to their explicit ones (see, e.g., *Chapman v. Pitcher* (1929) 207 Cal. 63, 68 [276 P. 1008]; *People v. McCoy* (2001) 25 Cal.4th 1111, 1121 [108 Cal.Rptr.2d 188, 24 P.3d 1210]), and no reason appears why we should treat *Robins* differently.

Some commentators apparently, at least for a time, found *Robins*'s applicability outside its context of a large shopping center uncertain because we there discussed "the role of the centers in our society" and emphasized the case did not implicate " 'the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment' " (*Robins, supra,* 23 Cal.3d at p. 910). But any questions left open by *Robins* on the state action question were laid to rest in *Gerawan,* where we stated unambiguously that the right of free speech granted by the state free speech clause "runs against the world, including private parties as well as governmental actors" (*Gerawan, supra,* 24 Cal.4th at p. 492). Indeed, we cited *Robins* (23 Cal.3d at pp. 908-911) for that very proposition.

The lead opinion dismisses *Gerawan*'s discussion of state action as "non-binding dictum." (Lead opn., *ante*, at p. 1029.) Nevertheless, for many of the same reasons, presumably, as led the author of the lead opinion only eight months ago to sign the majority opinion in *Gerawan*, I disagree that *Gerawan*'s dictum is unpersuasive. *Gerawan* based its rejection of a state action requirement on section 2(a)'s plain language (*Gerawan, supra,* 24 Cal.4th at pp. 489-492), buttressed by "the *peculiar character* of constitutions [like California's] dating to the 19th century, which are not so narrow" as to restrain only governmental actors (*id.* at p. 492). The *Gerawan* majority cited textual proof that the California Constitution must be counted among those that were drafted to protect against private, as well as governmental, intrusion on constitutional rights. (See *Gerawan, supra,* 24 Cal.4th at p. 493 [citing constitutional grant to wives of a separate property right as against their husbands and to husbands and wives a similar right as against one another].) I continue to find *Gerawan*'s analysis persuasive—its plain-language rationale for the reasons earlier stated, and its constitutional-character rationale on the basis of the scholarly authorities and textual examples that *Gerawan* provided.[2]

*Gerawan*'s progenitor, *Robins,* as the lead opinion recognizes, "has been the law in California for over 20 years" and is "embedded in our free speech jurisprudence with no apparent ill effects" (lead opn., *ante,* at p. 1022). Principles of stare decisis, therefore, oblige us to follow its holding. As explained above, that holding logically implies that section 2(a) carries no state action limitation.

Concededly, the *result* in *Robins* might be reconcilable with a rule—similar, perhaps, to that the lead opinion proffers—that would make free and open accessibility to the public a "threshold requirement" for applying the state free speech clause to the actions of a private property owner. (Lead opn., *ante,* at p. 1033.) But our *analysis* in *Robins* would not be so reconcilable.

Thus, when we referred in *Robins* to Court of Appeal cases citing the United States Supreme Court's decisions in *Marsh v. Alabama* (1946) 326 U.S. 501 [66 S.Ct. 276, 90 L.Ed. 265] and *Food Employees v. Logan Plaza*

---

[2]The lead opinion suggests that the justices in *Gerawan*'s majority "did not carefully consider whether California's free speech clause requires state action" (lead opn., *ante,* at pp. 1028-1029) when they stated that it "runs against the world, including private parties" (*Gerawan, supra,* 24 Cal.4th at p. 492), but that the statement may have been dictum does not mean it was ill considered. As explained above, moreover, and contrary to the lead opinion's further assertion, the *Gerawan* majority provided ample analytical support (lead opn., *ante,* at p. 1029) for its statement.

(1968) 391 U.S. 308 [88 S.Ct. 1601, 20 L.Ed.2d 603], we did so not with implicit approval of any state action reasoning in those underlying federal decisions (see lead opn., *ante*, at p. 1032); rather, we believed the Court of Appeal opinions to be useful in illustrating "the strength of 'liberty of speech' in this state." (*Robins, supra*, 23 Cal.3d at p. 908.) Irrespective of federal principles, we noted, "[t]he duty of this court is to help determine what 'liberty of speech' means *in California*." (*Id.* at p. 909, italics added.)

Ultimately, we explained our holding in *Robins* as "providing greater protection than the First Amendment now seems to provide" (*Robins, supra*, 23 Cal.3d at p. 910), affirming the long-standing principle that a " 'protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee' " (*id.* at p. 908).

Our decision in *Robins* rested expressly on our understanding "that sections 2 and 3 of article I of the California Constitution protect speech and petitioning, reasonably exercised," even on private property (*Robins, supra*, 23 Cal.3d at p. 910) and *not* on any "functional equivalence of the shopping center to a traditional public forum" (lead opn., *ante*, at p. 1032). In *Robins*, far from finding this functional equivalence, we found, much more modestly, that " '[a] handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations [citation] would not markedly dilute defendant's property rights.' " (*Robins, supra*, 23 Cal.3d at p. 911.) In considering the competing constitutional rights at stake, we nowhere referred, categorically, to "the public character of the property" (lead opn., *ante*, at p. 1032).[3] Rather, we considered the interest in "speech and petitioning, reasonably exercised," and "the role of [shopping] centers in our society" (*Robins, supra*, 23 Cal.3d at p. 910) in facilitating the exercise of such rights as against the " 'defendant's property rights' " (*id.* at p. 911), emphasizing that our result, in favoring free speech, might be different if " 'we . . . ha[d] under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment' " (*id.* at p. 910). We also expressly preserved property owners' right, despite constitutional constraints, to impose " 'reasonable regulations' " (*id.* at p. 911), avoiding any implication "that those who wish to disseminate ideas have free rein" (*id.* at p. 910).

In *Robins* we thus followed "the familiar and well-established constitutional analysis—applicable to other constitutional rights, such as freedom of

---

[3] Actually, the private property involved in *Robins*, contrary to the lead opinion's implication, was not open to the public without qualification, but only at certain times and "for the purpose of patronizing the many businesses." (*Robins, supra*, 23 Cal.3d at p. 902.)

speech . . . —under which a court considers the extent to which a defendant's actions infringe or intrude upon the plaintiff's constitutionally protected interest and 'balances' or 'weighs' such infringement against the relative importance or 'compelling' nature of the defendant's justifications for its actions (taking into account whether there are other, less intrusive means by which the defendant could achieve its objectives)." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 62 [26 Cal.Rptr.2d 834, 865 P.2d 633] (conc. & dis. opn. of George, J.).)[4]

We should adhere to our established constitutional jurisprudence in this case. Consequently, unless we conclude Golden Gateway's leafleting ban is a reasonable regulation of the speech at issue, we must balance the private and societal interest in that speech against any competing constitutional concerns that would be implicated were we to rule that section 2(a) forbids enforcement of that ban. (See, e.g., *Robins, supra,* 23 Cal.3d at pp. 910-911 [balancing signature gatherers' "wish to disseminate ideas" with concern " 'that these activities do not interfere with normal business operations' " and " 'property or privacy rights' " of occupants and owners].) We must also take into account the ban's impact on the right of Californians, generally, to receive unsolicited communications. (See generally *Van Nuys Pub. Co. v. City of Thousand Oaks* (1971) 5 Cal.3d 817, 825-826 [97 Cal.Rptr. 777, 489 P.2d 809] (*Van Nuys*); see also *Martin v. City of Struthers* (1943) 319 U.S. 141, 148-149 [63 S.Ct. 862, 865-866, 87 L.Ed. 1313].)[5]

A. *Is the ban a reasonable regulation of affected speech?*

Golden Gateway unquestionably retains the right to impose reasonable time, place, and manner restrictions on expressive activity at its premises.

---

[4]See, e.g., *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 166 [87 Cal.Rptr.2d 132, 980 P.2d 846] (conc. opn. of Werdegar, J.) ("[b]alancing . . . First Amendment free speech rights with the equally weighty right of plaintiffs to be let alone at their jobsite, free of racial discrimination"); *Sommer v. Metal Trades Council* (1953) 40 Cal.2d 392, 401-402 [254 P.2d 559] (noting the " 'effort in the cases has been to strike a balance between the constitutional protection of the element of communication in picketing and "the power of the State to set the limits of permissible contest open to industrial combatants" ' "); *Gill v. Hearst Publishing Co.* (1953) 40 Cal.2d 224, 228 [253 P.2d 441] (holding the "right 'to be let alone' and to be protected from undesired publicity is not absolute but must be balanced against the public interest in the dissemination of news and information consistent with the democratic processes·under the constitutional guaranties of freedom of speech and of the press").

[5]*Martin v. City of Struthers, supra,* 319 U.S. 141, and *Van Nuys, supra,* 5 Cal.3d 817, both were cases decided in the First Amendment context, but the free speech interests they involved were similar to those with which this case deals. "As a general rule, [moreover, California's] free speech clause and its right to freedom of speech are not only as broad and as great as the First Amendment's, they are even 'broader' and 'greater.' " (*Gerawan, supra,* 24 Cal.4th at p. 491, citing numerous authorities.)

(*Robins, supra*, 23 Cal.3d at pp. 910-911; *In re Hoffman* (1967) 67 Cal.2d 845, 852-853 [64 Cal.Rptr. 97, 434 P.2d 353].) Such restrictions must, however, be " ' "justified without reference to the content of the regulated speech, . . . narrowly tailored . . . , and . . . leave open ample alternative channels for communication of the information." ' " (*Savage v. Trammell Crow Co.* (1990) 223 Cal.App.3d 1562, 1573 [273 Cal.Rptr. 302], quoting *Clark v. Community for Creative Non-Violence* (1984) 468 U.S. 288, 293 [104 S.Ct. 3065, 3069, 82 L.Ed.2d 221].)

    1.   *Does the ban afford ample alternative channels for communication?*

Even assuming Golden Gateway's leafleting ban can be considered content neutral,[6] the record demonstrates that it fails to leave open ample alternative channels of communication, in that its only allowance for distribution of unsolicited printed matter is posting on laundry room bulletin boards.

Neither that the Tenants Association can use the public mails nor that it can distribute its leaflets off Golden Gateway's premises provides a constitutional alternative to door-to-door leafleting. Mailing a single leaflet to each address, the record suggests, would cost the Tenants Association more than $500, even assuming it could muster the volunteers to assemble, stuff, and address 1,254 envelopes. (See generally *City of Watseka v. Illinois Public Action Council* (7th Cir. 1986) 796 F.2d 1547, 1558 [mail and telephone not sufficient because "more expensive and less effective than in-person solicitation at the citizen's residence"].) Nor would standing on the sidewalk near the complex afford Tenants Association speakers a reasonable opportunity to "directly communicate their message to their targeted audience" (*Planned Parenthood v. Wilson* (1991) 234 Cal.App.3d 1662, 1674 [286 Cal.Rptr. 427]), some of whom (e.g., automobile drivers) may not use those sidewalks at all and all of whom, presumably, use them at most intermittently. As the United States Supreme Court has noted, "the most effective way of bringing [informational materials] to the notice of individuals is their distribution at the homes of people." (*Schneider v. State* (1939) 308 U.S. 147, 164 [60 S.Ct. 146, 152, 84 L.Ed. 155]; accord, *Van Nuys, supra*, 5 Cal.3d at pp. 823-825.)

---

    [6]The assumption may be faulty. The current version of Golden Gateway's ban, the first expressly to prohibit "leafleting," was promulgated shortly after the Tenants Association distributed flyers criticizing Golden Gateway's management and discussing a Tenants Association lawsuit against Golden Gateway. The record, moreover, suggests that Golden Gateway construes its ban as not restricting its *own* communicative prerogatives.

Although oral communication among tenants may be permitted, as the concurring opinion suggests (conc. opn., *ante*, at p. 1041),[7] the Building Standards forbid all unrequested *published discourse* by tenants except in the laundry rooms. As the state free speech clause protects the freedom of Californians to "write and publish" equally and identically with their right to "speak" their sentiments on all subjects, the Building Standards banning written and published discourse offend the clause equally and identically as would a rule that entirely forbade tenants to speak with each other on the premises except in the laundry rooms.

2. *Is the ban narrowly tailored to accomplish its legitimate objectives?*

The record also establishes that Golden Gateway's ban on solicitations and leafleting goes much further than is necessary to address its asserted legitimate concerns for tenant safety, tenant privacy, or cleanliness of the premises. As Golden Gateway conceded at trial, no breaches of security have occurred as a result of leaflet distribution. With respect to litter concerns, Golden Gateway acknowledged the Tenants Association already has agreed to retrieve from around tenants' doors, within 24 hours of distribution, any of its newsletters or leaflets that have not been collected by their intended recipients.

Nor would enforcing Golden Gateway's ban necessarily significantly enhance tenant privacy. While one of Golden Gateway's property managers opined at trial that unsolicited leafleting constituted an invasion of tenant privacy, he conceded that the only available alternative under Golden Gateway's ban, unrequested mail or telephone calls, would equally be so. And Golden Gateway conceded at trial that the Tenants Association already has agreed not to distribute leaflets or newsletters to any tenant who indicates a desire not to receive them. Were Golden Gateway's regulations more narrowly tailored in that direction, a tenant who prefers not to receive leaflets could simply post a "no leafleting" sign or appropriately advise the Tenants Association.

Golden Gateway's ban thus operates far more broadly than is necessary to effect its legitimate purposes. It may not, therefore, be enforced as merely a reasonable regulation of the time, place, or manner of the speech it would affect. (*Savage v. Trammell Crow Co.*, *supra*, 223 Cal.App.3d at p. 1573.)

---

[7]But such communication is not without restriction. Under the Building Standards' solicitation ban, tenants may not even *speak* with each other in the common areas of the building if to solicit membership in the Tenants Association, engage in religious proselytizing, distribute campaign literature, seek political or charitable contributions, or, indeed, seek support for causes of any kind.

B. *Balancing of affected constitutional interests*

Since Golden Gateway's ban is not a reasonable regulation, we must, in order to resolve this matter, balance the competing constitutional interests implicated in its efforts to prohibit the Tenants Association's leafleting. (See *Robins, supra,* 23 Cal.3d at pp. 910-911.) Such interests include, on the one hand, the Tenants Association's interest in freely speaking, writing and publishing to tenants at Golden Gateway Center and those tenants' interest in receiving the Tenants Association's written communications. They include, on the other hand, the privacy interests of individual tenants and Golden Gateway's property interests.

1. *Free speech*

The Tenants Association understandably desires to communicate regularly with the tenants of Golden Gateway about Tenants Association business and tenants' issues, generally. As previously noted, moreover, Golden Gateway tenants have a recognized interest in receiving even unsolicited communications. (See generally *Martin v. City of Struthers, supra,* 319 U.S. at pp. 147-148 [63 S.Ct. at pp. 865-866]; *Van Nuys, supra,* 5 Cal.3d at pp. 825-826.) We should be mindful of the "paramount and preferred place" that free speech enjoys in the hierarchy of rights in this state (*In re Lane* (1969) 71 Cal.2d 872, 878 [79 Cal.Rptr. 729, 457 P.2d 561]) and also should strive to avoid any balancing of constitutional interests that would relegate California apartment dwellers, as a group, to inferior status among speakers.

2. *Property rights*

Plaintiff, as landlord, complains its property rights will be diminished if its leafleting ban is not enforced. Such concerns, legitimate in the abstract, would seem overblown in this case to the extent that the tenants of Golden Gateway *already have undisputed rights* to be present in the hallways and throughout the common areas of their complex. Pursuant to their lease agreements, the tenants have the contractual right to be present in the hallways and throughout the common areas of the Golden Gateway Center. They also possess property rights entitling them to occupy and utilize the premises. Leaseholds possessed by tenants are as much estates in property as is a landlord's remaining ownership interest. Therefore, to construe section 2(a) to require of Golden Gateway a more appropriately tailored approach to regulation of tenant leafleting, as a matter of both law and fact, " 'would not markedly dilute [the landlord]'s property rights' " (*Robins, supra,* 23 Cal.3d at p. 911).

### 3. *Tenant privacy*

Golden Gateway makes much of the insulation from unsolicited appeals (and the high rents assertedly paid for such insulation) that the Building Standards purportedly are designed to preserve. As demonstrated, however, Golden Gateway's policies go far beyond reasonable regulation directed to such insulation. Even assuming that privacy concerns loom as large, practically speaking, as plaintiff would have us believe,[8] we should remain mindful that "a community may not suppress . . . the dissemination of views because they are unpopular, annoying or distasteful." (*Murdock v. Pennsylvania* (1943) 319 U.S. 105, 116 [63 S.Ct. 870, 876, 87 L.Ed. 1292, 146 A.L.R. 81].)

Enforcement of Golden Gateway's leafleting ban, which forbids the provision to any tenant of any leaflet not specially requested in advance, significantly would impact "the constitutional rights of those desiring to distribute literature and those desiring to receive it, as well as those who choose to exclude such distributers from the home." (*Martin v. City of Struthers, supra*, 319 U.S. at pp. 148-149 [63 S.Ct. at p. 866].) The net effect of enforcing Golden Gateway's total ban will be to deprive the residents of this sizable community of a traditional and important means of communicating with each other.

Ultimately, the appropriate "balance is tipped in favor of the right to voice ideas as opposed to the property rights or mere naked title of the owners" (*Allred v. Shawley* (1991) 232 Cal.App.3d 1489, 1496 [284 Cal.Rptr. 140]) of Golden Gateway Center.[9] And in my view, "proper accommodation of the competing [free speech] and privacy values at issue requires that the initial burden be placed on the homeowner to express his objection to the distribution of material." (*Van Nuys, supra*, 5 Cal.3d at p. 826.)[10]

---

[8]While Golden Gateway's property managers testified in general terms to tenant concern about leafleting, the record reveals that Golden Gateway ultimately could document only one resident complaint about door-to-door leafleting in over 15 years.

[9]This is not to say, of course, that free speech rights, when implicated, always must prevail over competing considerations. As we observed in *Robins*, for example, appropriate constitutional balancing of free speech interests against " 'the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment' " (*Robins, supra*, 23 Cal.3d at p. 910) might come out differently.

[10]Golden Gateway's ban does not distinguish between, and is not tailored separately to address, commercial and noncommercial speech. Moreover, Golden Gateway's Building Standards by their terms bar, and the injunction Golden Gateway seeks would burden, only tenant speech. We need not decide, therefore, what result an appropriate balancing of

## II.

The lead opinion never engages in a traditional analysis along the lines of the foregoing, arguing rather that Golden Gateway's restrictions on tenant speech do not implicate the state free speech clause in the first place. It takes as its fundamental premise that the state free speech clause protects only against state action, defining "the scope of this limitation" (lead opn., *ante*, at p. 1031) as encompassing "the actions of a private property owner . . . only if the property is freely and openly accessible to the public" (*id.* at p. 1033).[11]

For support, the lead opinion cites *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14, 595 P.2d 592], apparently for the proposition that state constitutional provisions carry a state action limitation "absent some 'suggestion' in the provision's history" to the contrary. (Lead opn., *ante*, at p. 1023.) But this court neither expressly nor impliedly addressed in *Gay Law Students* the question whether some kind of presumption of that nature might exist. Further, in *Gay Law Students* we spoke only to "the equal protection clause of the California Constitution" (24 Cal.3d at p. 466) and its "predecessor provision" (*id.* at p. 468). Similarly, in *Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 333 [70 Cal.Rptr.2d 844, 949 P.2d 941], the other case cited by the lead opinion on this point, we spoke to the state search and seizure provision. As the lead opinion's own authority notes, the question of "whether to apply constitutional restraints on private actors" is properly approached "only by reference to the text, history and purpose of individual clauses of the California Declaration of Rights. It must be answered separately for each clause, not generally for the entire constitution." (*Private Actors, supra*, 17 Hastings Const. L.Q. at pp. 111-112.)

Next, while acknowledging the absence from section 2(a) of an explicit state action limitation, the lead opinion asserts the state free speech clause nevertheless is ambiguous as to the implicit presence or absence of such a limitation. (Lead opn., *ante*, at p. 1024.) The lead opinion finds such ambiguity in the second sentence of the clause, asserting that its reference to

constitutional considerations would generate in a case implicating only commercial or only nontenant speech.

[11]For convenience, the discussion that follows occasionally employs the lead opinion's apparent shorthand expression "state action" for the "state or state-like action" limitation on state free speech rights the lead opinion would impose. As will appear, however, I disagree that *Robins* stands for the proposition that "private property must be public in character before California's free speech clause may apply" (lead opn., *ante*, at p. 1033). Still less am I willing to embrace the logically incoherent notion that "the actions of a private property owner constitute state action . . . if the property is freely and openly accessible to the public" (*ibid.*).

"law" abridging the liberty of speech or press might mean the framers feared only government intrusion, thus indicating an intent to protect only against state actions. (*Ibid.*) Such an inference is neither logically nor grammatically supportable.

First, although a type of state action requirement might be discerned in the clause's second sentence if it stood alone or purported to qualify the first sentence, as noted it does neither. The second sentence is preceded by and makes no reference to the first sentence; the first sentence, in turn, grants the free speech right without any limitation except that of responsibility for abuse of the right. The presence of the second sentence, with its express reference to state action in the form of "law," in fact bolsters the case for construing the first sentence in accord with its plain language, i.e., in accord with its lack of any such reference, and for construing the entire clause in accord with *its* plain language, i.e., in accord with the lack of any qualification on the scope of the free speech right it confers.

Second, scholars have recognized that the phrase "being responsible for the abuse of this right" in the first sentence of section 2(a) offers contextual evidence the framers' were aware the state free speech clause would limit private conduct. The reasoning is that the phrase likely was intended to preserve common law defamation actions for abusive speech, with the corollary that *non*abusive speech "should not be suppressed by a private suit for injunctive or damage relief. This, then, is evidence of awareness that the constitution could not only shield conduct (nondefamatory speech) from civil liability but also limit other private conduct (damage suits for nondefamatory speech) . . . . At the very least, its inclusion in 1849 supports the argument that the document's drafters . . . did not have a fixed notion that only the conduct of public actors could be affected by constitutional guarantees." (*Private Actors, supra,* 17 Hastings Const. L.Q. at p. 122.)

Third, were it accurate that the framers " 'feared only government intrusions' " (lead opn., *ante,* at p. 1024), the proffered conclusion—that in drafting the state free speech clause as a whole the framers "intended to impose a state action requirement" (*ibid.*)—would not follow, for, as the lead opinion itself notes, the framers, regardless of what type of intrusion they feared most, evidently also " 'wished to declare generally the sanctity of free expression' " (*ibid.*) as against the world. (See also *Gerawan, supra,* 24 Cal.4th at pp. 492-493.) The language they employed does just that.

Plain English is not ambiguous unless "there are two meanings which may reasonably be attributed to the term in question." (*Reserve Insurance Co. v.*

*Pisciotta* (1982) 30 Cal.3d 800, 815 [180 Cal.Rptr. 628, 640 P.2d 764] [contract provision]; see also *Davis v. City of Berkeley* (1990) 51 Cal.3d 227, 235 [272 Cal.Rptr. 139, 794 P.2d 897] [constitutional provision].) Applying this fundamental principle of construction, we previously have held that a constitutional liberty conferred without qualification is neither " 'ambiguous or doubtful' " in scope but, rather, " 'applies to all . . . substantial . . . impair[ments]' " of the right conferred and " 'is not aimed solely at' " (*Meriwether Invest. Co., Ltd. v. Lampton* (1935) 4 Cal.2d 697, 703 [53 P.2d 147]) any subset thereof. (See also *Welsh v. Cross* (1905) 146 Cal. 621, 624 [81 P. 229].)[12] Ultimately, the same principle applies here. In light of its unqualified statement of the free speech right, section 2(a) is not susceptible of being construed as applicable only against state or state-like action.

In short, the lead opinion fails to demonstrate that, despite its plain language and contrary to our pronouncements in *Robins* and *Gerawan*, section 2(a) contains ambiguities regarding state action the resolution of which requires recourse to extrinsic sources concerning the framers' intent. But even were such ambiguities present, I would conclude, based on section 2(a)'s history and context, that—as *Robins* impliedly held and *Gerawan* confirmed—our Constitution grants a free speech right running against private parties as well as state actors.

The state free speech clause first appeared as article I, section 9 of the original California Constitution of 1849: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions . . . for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact." (Cal. Const. of 1849, art. I, § 9.)

The clause next appeared as article I, section 9 of the present California Constitution of 1879. It was identical to its predecessor but for the addition of a sentence further relating to criminal libel. (See Cal. Const., art. I, former

---

[12]Specifically, in *Meriwether* we held that, in forbidding any " ' "law impairing the obligation of contract," ' " former article I, section 16 of the California Constitution plainly was " 'not aimed solely at laws which expressly destroy or annul contracts.' " (*Meriwether Invest. Co., Ltd. v. Lampton, supra,* 4 Cal.2d at p. 703.) In *Welsh,* we reasoned that, as that clause by its terms "is not aimed solely at" laws which *expressly* annul contracts, it "applies to all laws which in any substantial degree" have that effect. (*Welsh v. Cross, supra,* 146 Cal. at p. 624.)

§ 9, as adopted May 7, 1879.)[13] In 1974, the clause was revised by the addition of new section 2 to article I and the deletion of old section 9: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, added Nov. 5, 1974.)[14] Finally, the clause was redesignated in 1980 as article I, section 2, subdivision (a).

Thus, like the present clause, the state free speech clause as originally drafted drew no distinction between state actors and private parties, impliedly therefore granting a free speech right that runs against both. Also like the present clause, the original clause expressly noted speakers' responsibility for "abuse" of the free speech right, language that—to the extent it may be read as preserving the right of aggrieved private parties to sue for defamation (see *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1203 [31 Cal.Rptr.2d 776, 875 P.2d 1279])—the lead opinion's proffered state action requirement would render superfluous.

Examination of the constitutional context of the original state free speech clause, as originally enacted and as it appears today, buttresses the conclusion that it grants a right of free speech running against private parties as well as state actors. Enacted together with the free speech clause in the Constitution of 1849 was a clause that granted to wives a separate property right as against their husbands, who were obviously private parties. (Cal. Const. of 1849, art. XI, § 14.) This separate-property clause clearly illustrates that the free speech clause was not unique, in 1849, in granting rights against private parties as well as state actors.

Today the state free speech clause appears in the same article as the privacy clause: "All people are by nature free and independent and have inalienable rights. Among these [is] . . . privacy." (Cal. Const., art. I, § 1.) The right of free speech and the right of privacy complement each other, the former dealing with communication to others (see *Spiritual Psychic Science Church v. City of Azusa* (1985) 39 Cal.3d 501, 510-511 [217 Cal.Rptr. 225,

---

[13]The additional sentence read: "Indictments found, or information laid, for publications in newspapers shall be tried in the county where such newspapers have their publication office, or in the county where the party alleged to be libeled resided at the time of the alleged publication, unless the place of trial shall be changed for good cause." (Cal. Const., art. I, former § 9, as adopted May 7, 1879.)

[14]This revision retained, without substantial change, the state free speech clause at its core and removed the provisions relating to procedure in prosecutions for criminal libel as more suited to statute than constitution. (See Ballot Pamp., Gen. Elec. (Nov. 5, 1974) analysis of Prop. 7 by Legis. Analyst, p. 26.)

703 P.2d 1119] [implying speech "communicates a message" from speaker to audience]), the latter dealing both with conduct apart from others and information kept from others (see *Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 387 [33 Cal.Rptr.2d 63, 878 P.2d 1275]; *Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th at pp. 35-36). Just as the right of privacy runs against private parties as well as state actors (*Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th at pp. 15-20), so too, as demonstrated, runs the right of free speech.

Given that the history and context of the California free speech provision sufficiently confirm its meaning, any excursion into the history of the New York Constitution from which the clause derived is unnecessary. Nor is the relevance of that history clear. The lead opinion posits no evidence that the framers of California's Constitution were aware of or indeed intended to adopt those aspects of the New York history that relate to state action. Nor does it persuade that the framers of the New York Constitution "intended its free speech clause 'to serve as a check on governmental, not private, conduct.' " (Lead opn., *ante,* at p. 1025.) The authorities underlying *SHAD Alliance v. Smith Haven Mall* (1985) 66 N.Y.2d 496 [498 N.Y.S.2d 99, 488 N.E.2d 1211], cited by the lead opinion, as well as the lead opinion's other authorities, tend upon examination to support only the first half of that claim, i.e., that the New York framers wished to guard against government encroachments on speech, not the latter half, i.e., that they wished not to guard against private encroachments. (See, e.g., *SHAD Alliance, supra,* 66 N.Y.2d at p. 502 [488 N.E.2d at p. 1215] [citing various scholars for the truism that "a Bill of Rights is designed to protect individual rights against the government"].) One commentator, noting that the New York "minutes do not reveal why the delegates chose to declare an open-ended right rather than simply to prohibit oppressive 'laws,' " reasons that "perhaps [the broader language] was more attractive precisely because it secured a precious liberty against the entire world." (*Private Actors, supra,* 17 Hastings Const. L.Q. at p. 120.)

Finally, whatever the decisions of most of our sister courts (see lead opn., *ante,* at p. 1030), what matters is the meaning of *California's* free speech clause. Any assertion that there exists a uniform and unchanging "American constitutional theory" (*ibid.*) is not supportable. (See generally Baum & Fritz, *American Constitution-Making: The Neglected State Constitutional Sources* (2000) 27 Hastings Const. L.Q. 199, 199-201; Fritz, *The American Constitutional Tradition Revisited: Preliminary Observations on State Constitution-Making in the Nineteenth-Century West* (1994) 25 Rutgers L.J. 945, 952-956, 964-971.)

Ultimately, neither the text of the state free speech clause, the history of its adoption, our prior pronouncements, nor considerations of constitutional theory support judicial imposition of a state action limitation on Californians' free speech rights. Consequently, I join with the Chief Justice in rejecting the lead opinion's discussion and conclusions with regard to the state action doctrine (conc. opn., *ante*, at p. 1036) and would adhere to our traditional understanding that, even when a restriction on speech "does not implicate any right to freedom of speech under the First Amendment, [it may nevertheless] implicate such a right under [California's free speech clause]" (*Gerawan, supra,* 24 Cal.4th at p. 476).

### III.

Regrettably, four justices of this court join today in denying constitutional protection to the tenant speech at issue here. The concurring opinion, like the lead opinion, emphasizes that Golden Gateway's premises are not open to the public. To that extent, I agree this case is different from *Robins* factually. I disagree the distinction is dispositive. Rather, that the owner of private property may exclude members of the general public from entry onto the premises without necessarily implicating their free speech rights says little about the rights of those who are lawful members of a community occupying units of the property as their residences.

Both opinions, moreover, overlook a critical respect in which this case is factually *similar* to *Robins*: The private property owner seeking to restrict speech already has for its own purposes surrendered to those whose speech it would restrict much of its interest in retaining exclusive control over the premises. Golden Gateway seeks to enjoin tenant speech (as the owners of the shopping center in *Robins* sought to restrict some patrons' speech), but it already has surrendered to tenants, for virtually the entire range of activities and uses associated with daily living, the hallways and other common areas of the building. Similarly, as the lead and concurring opinions acknowledge, the owners of the shopping center in *Robins* had "invited [the public] to visit for the purpose of patronizing the many businesses" there (*Robins, supra,* 23 Cal.3d at p. 902).

The concurring opinion concludes that the tenant speech Golden Gateway's leafleting ban would affect lies outside "the appropriate limit of th[e] substantive right of free speech" (conc. opn., *ante,* at p. 1036). But contrary to the concurring opinion, Golden Gateway's ban is not a " 'reasonable regulation, by an owner, of conduct inside [its] multiple dwelling' " (*ibid.,* quoting *Watchtower Bible & Tract Soc., Inc. v. Metropolitan Life Ins. Co.*

(1948) 297 N.Y. 399 [79 N.E.2d 433, 436-437, 3 A.L.R.3d 1423], italics in conc. opn. omitted). As explained above, the ban goes much further than is necessary to address any legitimate concerns Golden Gateway may have about tenant safety, tenant privacy, or cleanliness of the premises.

With the concurring opinion, therefore, I reject a view of our state free speech clause that "effectively would remove any state constitutional obstacle to any . . . action by a landlord, union, or employer" implicating an individual's core free speech rights. (Conc. opn., *ante,* at p. 1043.) But I also reject the concurring opinion's approach, which would do much the same with respect to published communications, despite their constitutionally equal—and traditionally cherished—status in this state as protected expressive activity.

### Conclusion

For the foregoing reasons, I would reverse the judgment of the Court of Appeal.

Kennard, J., and Klein, J.,* concurred.

---

*Presiding Justice of the Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.